# THE MINNESOTA RATE CASES.

## SIMPSON ET AL., CONSTITUTING THE RAIL-ROAD AND WAREHOUSE COMMISSION OF THE STATE OF MINNESOTA v. SHEPARD.

## SAME v. KENNEDY.

## SAME v. SHILLABER.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.

Nos. 291, 292, 293.    Argued April 9, 10, 11, 12, 1912.—Decided June 9, 1913.

These appeals involve the validity of the orders of the Railroad and Warehouse Commission, and the legislative acts, of the State of Minnesota prescribing maximum rates for freight, and a maximum fare of two cents a mile for passengers. The rates relate to traffic exclusively between points within the State. It was contended, however, that as applied to cities on the State's boundary, or to places within competitive districts crossed by the state line, the rates disturbed the relation previously existing between interstate and intrastate rates, thus imposing a direct burden upon interstate commerce and creating discriminations as against localities in other States. The rates were also assailed as confiscatory. The rates are sustained as to the Northern Pacific and Great Northern companies. In the case of the Minneapolis and St. Louis Railroad Company, the rates are held to be confiscatory in view of the particular facts shown with respect to that road.

In reviewing the questions involved, the court *held* that:

The Federal Constitution gives Congress an authority at all times adequate to secure the freedom of interstate commercial intercourse from state control and to provide effective regulation of that intercourse as the National interest may demand.

The commerce that is confined within one State, and does not affect other States, is reserved to the State. This reservation is only of that power which is consistent with the grant to Congress.

The authority of Congress extends to every part of interstate commerce and to every instrumentality or agency by which it is carried

on; and the full control by Congress over the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations.

Even without action by Congress, the commerce clause of the Constitution necessarily excludes the States from direct control of subjects embraced within the clause which are of such a nature that, if regulated at all, their regulation should be prescribed by a single authority. There is thus secured the essential immunity of interstate intercourse from the imposition by the States of direct burdens and restraints.

There remains to the States the exercise of the power appropriate to their territorial jurisdiction in making suitable provision for local needs. The State may provide local improvements, create and regulate local facilities, and adopt protective measures of a reasonable character in the interest of the health, safety, morals and welfare of its people, although interstate commerce may incidentally or indirectly be involved.

Where matters falling within the state power, as above described, are also by reason of their relation to interstate commerce within the reach of the Federal power, Congress must be the judge of the necessity of Federal action; until Congress does act, the States may act.

The paramount authority of Congress enables it to intervene at its discretion for the complete and effective government of that which has been committed to its care, and, for this purpose and to this extent, in response to a conviction of national need, Congress may displace local laws by substituting laws of its own.

Regulation of railroad rates by the State began with railroad transportation.

The authority of the State to prescribe what shall be reasonable charges for intrastate transportation is state-wide, unless it be limited by the exertion of the constitutional power of Congress with respect to interstate commerce and its instruments. As a power appropriate to the territorial jurisdiction of the State it is not confined to a part of the State, but extends throughout the State—to its cities adjacent to its boundaries as well as to those in the interior of the State. If this authority of the State be restricted, it must be by virtue of the actual exercise of Federal control and not by reason merely of a dormant Federal power, that is, one which has not been exerted.

Congress in the Act to Regulate Commerce expressly provided that the provisions of the act should not extend to transportation wholly within one State.

Having regard to the terms of the Federal statute, the familiar range

of state action at the time it was enacted, the continued exercise of state authority in the same manner and to the same extent after its enactment, and the decisions of this court recognizing and upholding such authority, this court finds no foundation for the proposition that the Act to Regulate Commerce contemplated interference with the authority of the State to prescribe reasonable rates for the exclusively internal traffic throughout the extent of its territory.

Neither by the original act nor by its amendment, has Congress sought to establish a unified control over interstate and intrastate rates; it has not set up a standard for intrastate rates or prescribed, or authorized the Federal commission to prescribe, either maximum or minimum rates for intrastate traffic.

The fixing of reasonable rates for intrastate transportation was left by the act where it had been found, that is, with the States and the agencies created by the States to deal with that subject.

Under the established principles governing state action, Minnesota did not transcend the limits of its authority in prescribing the rates here involved, assuming them to be reasonable intrastate rates. It exercised an authority appropriate to its territorial jurisdiction and not opposed to any action thus far taken by Congress.

The interblending of operations in the conduct of interstate and local business by interstate carriers, and the exigencies that are said to arise with respect to the maintenance of interstate rates by reason of their relation to intrastate rates, are considerations for the practical judgment of Congress.

When the situation becomes such that adequate regulation of interstate rates cannot be maintained without imposing requirements with respect to such intrastate rates of interstate carriers as substantially affect interstate rates, it is for Congress to determine, within the limits of its constitutional authority over interstate commerce and its instruments, the measure of the regulation it should supply.

It is the function of the court to interpret and apply the law already enacted, but not, under the guise of construction, to provide a more comprehensive scheme of regulation than Congress has decided upon.

In the absence of Federal action, effect may not be denied to the laws of the State enacted within the field which it is entitled to occupy until its authority is limited through the exertion by Congress of its paramount constitutional power.

As to whether the rates are confiscatory, *held* that:

The rate-making power is a legislative power and necessarily implies a range of legislative discretion.

This court does not sit as a board of review to substitute its judgment for that of the legislature or of the commission lawfully constituted by it, as to matters within the province of either.

The question involved is whether, in prescribing a general schedule of rates involving the profitableness of the intrastate operations of the carrier, taken as a whole, the State has superseded the constitutional limit by making the rates confiscatory.

While the property of railroad corporations has been devoted to a public use, the State has not seen fit to undertake the service itself and the private property embarked in it is not placed at the mercy of legislative caprice, but rests secure under the constitutional protection which extends not merely to the title, but to the right to receive just compensation for the services given to the public.

For fixing rates the basis of calculation of value is the fair value of the property of the carrier used for the convenience of the public. *Smyth v. Ames*, 169 U. S. 466.

There is no formula for the ascertainment of the fair value of property used for convenience of the public, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts.

Where a carrier does both interstate and intrastate business, to determine whether a scheme of maximum intrastate rates affords a fair return the value of the property employed in intrastate business and the rates prescribed must be considered separately, and profits and losses on interstate business cannot be offset.

Assets and property of a carrier not used in the transportation business cannot be included in the valuation as a basis for rate making.

Property of a railroad company cannot be valued for a basis of rate making at a price above other similar property solely by reason of the fact that it is used as a railroad, and increases in value over cost cannot be allowed beyond the normal increase of other similar property.

In valuing the plant of a carrier for purpose of fixing rates there should be proper deductions for depreciation.

Where the constitutional validity of state action is involved general estimates of division between interstate and intrastate business cannot be accepted as adequate proof to sustain a charge of confiscation.

In the cases of the Northern Pacific and Great Northern companies on the examination of estimates of value, and methods of apportionment, *held* that the proof is insufficient to justify a finding that the rates were confiscatory; and in each of those cases the decrees are reversed with instructions to dismiss the bill without prejudice.

In the case of the Minneapolis and St. Louis Railroad Company, *held*, in view of the special facts appearing, that the margin of error in the estimates and calculations was not sufficient to affect the result. The decree in that case, adjudging the rates to be confiscatory, is therefore affirmed with the modification that the State may apply to the court by bill or otherwise, as advised, for a further order or decree whenever it shall appear that by reason of a change in circumstances the rates fixed by the State's acts and orders are sufficient to yield to this company reasonable compensation for the services rendered.

184 Fed. Rep. 765, modified and in part affirmed and in part reversed.

THESE appeals involve the validity of the orders of the Railroad and Warehouse Commission, and the legislative acts, of the State of Minnesota prescribing maximum rates for freight, and a maximum fare of two cents a mile for passengers. The rates relate to traffic exclusively between points in the State. It was contended, however, that as applied to cities on the State's boundary, or to places within competitive districts crossed by the state line, the rates disturbed the relation previously existing between interstate and intrastate rates, thus imposing a direct burden upon interstate commerce and creating discriminations as against localities in other States. The rates were also assailed as confiscatory.

*Mr. Thomas D. O'Brien* for appellants:

The judgments in the court below enjoined the enforcement of three distinct schedules. The first of these was prescribed September 6, 1906, by an order of the Railroad & Warehouse Commission after an exhaustive hearing. It was accepted by the carriers and put in operation, and remained in effect until the entry of the judgments in 1911. The subsequent enactment of the passenger and commodity rates by the legislature of Minnesota had no effect upon the validity of the merchandise rates thus voluntarily accepted by the carriers. Acceptance of those

rates by the officers of the carriers bound the stockholders of each company. The statutes of Minnesota prohibit a change in a lawfully adopted rate without application to the Railroad & Warehouse Commission, hence, the complainants as stockholders had no cause of action to enjoin the further observance of the rates upon classified merchandise.

The Circuit Judge, following the findings of the Master, determined that the carriers were entitled to a return of seven per cent. upon the cost of reproducing new the property devoted to the service.

This was ascertained by assuming that the railway was non-existent, and that it was necessary for the company now to acquire, under present conditions, its right of way and terminal lands, and construct and equip the railway as it now actually exists.

By adding to the market value, as that term has always been understood, allowances for severance damage, cost of acquisition and railway value, the lands were given a purely fictitious value ranging from 130 to 225 per cent. of the present market value.

Part of the lands so valued were those over which an easement for right of way had been donated by the Government; others, in which an easement had been acquired by condemnation; others, lands purchased for future use and not now actually used for transportation purposes, and areas in streets in municipalities upon which easements had been granted.

Property other than lands may be included under the term "construction." The assumption of reproduction being similarly fictitious as to this class of property, necessarily led to an equally false conclusion.

By following literally the fiction of reconstruction, excessive unit prices were employed upon the theory that construction upon such a large scale would tend to enhance prices. Allowances were made for contingencies to

be encountered, engineering expenses and interest during construction, covering the period arbitrarily taken for completion of the assumed work. At the same time the fact that the property, being valued, constituted a completed plant actually ·earning large net returns was ignored.

Although it was found that depreciation existed, no allowance was made on that account; nor was a definite amount of depreciation found, but there was offset against depreciation "knowledge derived from experience, adaptation to the needs of the public, readiness to serve, together with physical appreciation of. roadbed, and a reasonable amount of working capital always on hand for immediate use."

There is no relation between the depreciation of a specific item of property, and the items thus sought to be offset against it, nor can a Master be thus permitted to strike a balance mentally, rather than give specific amounts appearing upon each side of the account.

The result arrived at by this method bore no relation to present value. It consisted in imagining every existing condition to be absent, and substituting as facts purely fictitious and imaginary conditions and circumstances.

Therefore the court having found as a basis upon which to predicate rates, only "reproduction cost," arrived at by improper methods and assumptions, and having entirely disregarded every other element going· to make up fair value, and having erroneously included many· items of property upon which carriers are not entitled to earn a return, there was no finding of · value upon which to compute the return, and therefore, no basis for the finding of confiscation. *Knoxville* v. *Water Co.*, 212 U. S. 1; *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 17; *Railroad Commission* v. *Cumberland Tel. C. Co.*, 212 U. S. 414; *Omaha* v. *Water Co.*, 218 U. S. 18.

To entitle a physical valuation, for rate making pur-

poses, to any consideration, it must be based upon an inventory which properly segregates the items of property. To this end land should be divided into four classes: (a) Donated right of way; (b) secured by condemnation; (c) purchased for prospective use; (d) secured by private purchase.

Construction should be divided between; (e) that procured or produced by the expenditure of private means; (f) that procured or purchased by the use of earnings.

(a) Where a right of way has been donated free of cost it should not be included in the aggregate amount upon which to base a return, since it is a mere privilege granted by the public to the carrier, to enable it to make its actual investment reasonably profitable, without the imposition of exorbitant rates. Thus considered, the public and the carrier obtain the full benefit of the grant.

(b) Lands secured under the right of eminent domain should never be valued at more than original cost, since only an easement is thus obtained, and that through the exercise by the carrier of the governmental power delegated to it under a free grant from the State.

(c) Lands purchased for prospective use should not be included, if for no other reason than this; that the practice would permit a carrier to speculate in land, the carrying charges being paid by the public.

In addition to the fact that a large portion of the estimated cost of construction accrued from the use of earnings, the items "engineering," "contingencies" and "interest during construction" should not have been included in the inventory.

Since the valuation is of specific items actually in existence, there can be no contingencies, and since no money is to be borrowed, but upon the contrary the railway is a going concern, producing net earnings, there is no interest to be paid. The amounts claimed necessarily depend upon the assumptions indulged in by the estimator. The

evidence now before this court shows these to vary to an extent sufficient alone to demonstrate the impropriety of their use.

Assuming that present physical value is an element to be considered in arriving at the fair value which, as said in *Smyth* v. *Ames,* should be taken as the basis upon which to compute the return, the method here adopted for arriving at the "cost of reproduction new" does not determine present value.

The fictions of re-acquisition and re-construction were taken throughout as elements of value in themselves, and the irresistible conclusion is that the total amount found bears no closer relation to the truth than do the assumptions upon which that amount was based.

During recent years this method for determining present value has been frequently pressed upon the attention of the Interstate Commerce Commission, resulting in its complete rejection by that distinguished body. *Spokane* v. *N. P. Ry. Co.,* 15 I. C. C. Rep. 376; *Western Advance Cases,* 20 I. C. C. Rep. 307.

The record teems with specific instances of gross over-valuation, amounting in the aggregate to an appalling sum, and if the method itself is now approved of, as a matter of law, not only supervising officers, but courts as well, will be helpless in any effort to establish reasonable values.

In the cases of the Northern Pacific and Great Northern companies, the capital stock admittedly represented properties of enormous values not devoted to railway purposes. Notwithstanding this, the return which the Master finds would be received under the rates in controversy, would amount to a net return of seven per cent. upon the proportion of the capital stock assignable to Minnesota intrastate business based upon the Master's methods for the assignment of value, while seven per cent. upon "cost of reproduction new," as here found, would result in a return,

basing the computation upon the capitalization when the suits were commenced, of more than fifteen per cent. to the Northern Pacific and more than eighteen per cent. to the Great Northern.

The total capitalization of the three railway companies here considered (Minneapolis & St. Louis, Minnesota proportion only) was, January 1, 1905, in millions 596. Reproduction cost as found 931, or 156.26% of capitalization. Apply this ratio to all the railways in the United States, and we have capitalization of about. 18,890 millions; reproduction cost over 29,000 millions; actual excess about 10,627 millions. To return seven per cent. upon the excess alone would require the sum of 744 million dollars per annum. It is impossible to imagine that confiscation can be predicated upon a result arrived at by any such method.

*Mr. Edward T. Young,* also for the appellants:

In holding that the rates here involved violated the. commerce clause of the Federal Constitution, the court below held in effect:

That in addition to its plenary power of control over interstate commerce, Congress also has power to prescribe the standards and rules for the regulation of intrastate commerce, so as to prevent intrastate rates from indirectly affecting interstate rates.

That notwithstanding the express declaration of the Interstate Commerce Act that its provisions do not apply to intrastate commerce, that act does nevertheless so apply, and in such application it amounts to an exercise by Congress of its power over intrastate commerce.

That differences between interstate and intrastate rates amount to discrimination between localities as the same is prohibited by the Interstate Commerce Act, though the intrastate rates be prescribed by public authority and the interstate rates be fixed by the carriers themselves, without regard to the inherent reasonableness or unreason-

ableness of either set of rates as to the traffic to which they apply, and in all such cases the intrastate rates are void.

That under the Interstate Commerce Law, railroads have such a vested right to the inviolable enjoyment of interstate rates fixed by themselves regardless of their inherent reasonableness, that they may, under the plea of discrimination between localities, prevent a State from fixing fair and reasonable rates for its internal commerce, if such reasonable intrastate rates differ from, and might therefore indirectly, menace the continuation of the interstate rates made by the carriers.

That the indirect or incidental effect of state-made rates on interstate rates may amount to unconstitutional "interference" if it is substantial in degree, and the extent of such indirect effect, and whether it is sufficient in degree to be unconstitutional must be determined by the court as a question of fact whenever it is raised.

Each of the foregoing propositions is at variance with the theory of our dual form of government, and contrary to every decision of this court. *Gibbons* v. *Ogden*, 9 Wheat. 194; *Sands* v. *Manistee R. I. Co.*, 123 U. S. 288, 295; *Ill. Cent. R. Co.* v. *McKendree*, 203 U. S. 514; *Howard* v. *Ill. Cent. R. Co.*, 207 U. S. 463; *M. P. R. Co.* v. *Kansas*, 216 U. S. 262.

As to apportioning value, the court below erroneously made the apportionment of the value of the property used in common in interstate and intrastate business on relative revenue for the year of the test, thereby assigning to intrastate business a much higher proportion of the value of the property than the volume of intrastate business for the same period measured in ton and passenger miles, bears to the interstate business done in the State.

As to apportioning common cost, there is a difference in the cost of handling interstate and intrastate freight, arising mainly out of the different train service it receives.

There are two classes of freight trains, the "through," which runs from end to end of a division without change, and the "local," which transacts business at intermediate stations. The local train is the more expensive, and the through trains the less expensive.

Each of these trains carries state and interstate commerce. Therefore, to determine the cost of each class of business it is necessary to first ascertain the cost of each class of trains upon each division; next to ascertain the tonnage of each class of freight upon these respective trains; and thereafter, the determination of the average cost per ton-mile of each class, state and interstate, is a comparatively simple mathematical problem.

The appellants by the testimony of their accountant, as well as by the admissions made upon cross-examination of witnesses called by appellees, demonstrated that by the application of modern cost accounting, the cost of each class of service could be determined with substantial mathematical accuracy.

The court below erroneously based its findings on opinions expressed by railway officials who confessedly ignored the most important consideration going to make up the difference in cost, namely, whether the articles were carried upon through or local trains upon each operating division, and without attempting to distinguish between cost items incurred in the actual hauling of freight, and those incurred in the general maintenance of the business.

The extra cost thus imposed upon intrastate business was much in excess of what the facts would warrant.

*Mr. George T. Simpson,* Attorney General of the State of Minnesota, and *Mr. Lyndon A. Smith* were on the brief, for appellants:

*Mr. Clifford Thorne, Mr. H. T. Clarke, Jr., Mr. Geo. A. Henshaw, Mr. John Marshall, Mr. Royal C. Johnson,*

*Mr. P. W. Dougherty, Mr. Grant G. Martin, Mr. U. G. Powell, Mr. John H. Henderson, Mr. Dwight N. Lewis, Mr. William D. Williams, Mr. W. H. Stutsman* and *Mr. H. R. Oglesby,* by leave of the court, filed a brief as *amici curiæ* on behalf of the Railroad Commissions of Nebraska, Iowa, Kansas, South Dakota, North Dakota, Oklahoma, Missouri and Texas:

*Mr. Charles W. Bunn* for appellees.

The state rates operate directly and necessarily upon commerce among the States, destroying that commerce and the regulation thereof by Federal authority.

This is affirmed as a fact, as to which it was found by the Master:

In 1906 the railway companies were carrying passengers and freight locally within Minnesota at the same charges established for the same distances by interstate tariffs filed with the national commission.

The Railroad and Warehouse Commission made a reduction in all class rates, effective November 15, 1906, amounting from twenty to twenty-five per cent. The legislature (Laws of 1907, c. 232) ordered a reduction amounting to over seven per cent. in charges on grain, lumber, live animals and coal, and by Laws 1907, c. 97, reduced passenger fares from three to two cents per mile.

Among other things, the Master found that local and interstate freight and passengers are handled by the same employés and facilities, are carried in the same trains and in the same cars and must be handled in this manner in the exercise of fair economy; that much the larger part of business transported in or through Minnesota is interstate; that conditions of transportation of traffic in Wisconsin, Minnesota, North and South Dakota, and, as to much traffic, conditions in Montana, are the same whether the transportation is local in a State or between

States; that both the local and interstate traffic in question move from the same and similar points of origin and to the same and similar destinations, and that any substantial change in local rates without a corresponding change in interstate rates would constitute unjust discrimination.

It was found also that the local rates were reduced to a basis below the interstate rates for much longer hauls, established under the Interstate Commerce Act and partly by express orders of the Interstate Commerce Commission, applicable to traffic between Minnesota and other States and from one State to another extending across Minnesota; and that the local rates decreased to such an extent with distance that extending them for considerable distances beyond the state line showed enormous discrepancies between the extended state rates and the established interstate rates.

The operation on interstate commerce of the said Minnesota laws and commission orders was found to be immediate, direct and substantial in the following respects: (a) in destroying interstate rates; (b) in destroying interstate commerce by substituting local in lieu of interstate rail movement; (c) in turning over to one carrier the interstate commerce of another, which would occur in many cases unless the competing carrier would adopt the state rate for its interstate business; (d) in destroying the interstate commerce of cities of other States, should the carriers serving them fail to apply to them rates on the basis of the Minnesota rates.

On the findings appellees contend that:

If the carrier should obey the Minnesota laws and orders and reduce its rates to the line of the State, it could not maintain its previously existing higher interstate rates to and from points beyond the state line without violating the third section of the Interstate Commerce Law, which forbids unjust discrimination; that the only

answer attempted to be made to this contention, viz., that such a difference in rates would be only a difference and not a discrimination, is unsound. Appellants contend that the power of the States to regulate their internal commerce is equal to the power of Congress to regulate commerce among the States; that the two regulating authorities are like sovereigns foreign to and independent of each other, and consequently Congress cannot prohibit, under its power to regulate commerce, discriminations in favor of commerce wholly within a State as against commerce among the States. Appellees contend, however, that this sort of discrimination was largely, even principally, what the commerce clause in the Federal Constitution was intended to prevent; that the power over commerce with foreign nations and among the States is vested in Congress as absolutely as it would be in a single general government were there no States. *Gibbons* v. *Ogden,* 9 Wheat. 197; *Champion* v. *Ames,* 188 U. S. 321, 347; *Welton* v. *Missouri,* 91 U. S. 275, 280; *Mobile* v. *Kimball,* 102 U. S. 691, 696; *Gloucester Ferry Company* v. *Pennsylvania,* 114 U. S. 196, 203; *Robbins* v. *Shelby Taxing District,* 120 U. S. 489, 493; *Northern Securities Co.* v. *United States,* 193 U. S. 197, 349. The framers of the Constitution never intended that the legislative power of the Nation should find itself incapable of disposing of a subject-matter specifically committed to its charge. *In re Rahrer,* 140 U. S. 545, 562.

Congress may lawfully exercise, and has long exercised, exclusive power to regulate navigation and commerce by water, even navigation and commerce wholly local within a State. Such action implies no direct power to invade the State, but is necessarily incidental to the power expressly granted to Congress to regulate commerce among the States. *Gibbons* v. *Ogden,* 9 Wheat. 1, 204; *Wisconsin* v. *Duluth,* 96 U. S. 379, 387; *The Daniel Ball,* 10 Wall. 557; *The Hazel Kirke,* 25 Fed. Rep. 601; *Oyster*

*Police Steamers,* 31 Fed. Rep. 763; *Patterson* v. *Bark Eudora,* 190 U. S. 169; *In re Garnett,* 141 U. S. 1; *The Lottawanna,* 21 Wall. 558, 577. The power to regulate commerce is the true foundation of the laws of Congress touching navigation. It is difficult to maintain the suggestion in *Butler* v. *Boston Steamship Co.,* 130 U. S. 527, and *In re Garnett,* 141 U. S. 1, that Congress has any broader authority than the commerce power by virtue of Art. III, § 2, of the Constitution, granting judicial power to the Federal courts; because, if this grant of judicial power be held to contain a grant of power to Congress over maritime matters, it would appear to follow that, by the grant of power to the courts to try actions between States, between citizens of different States and between aliens and citizens of a State, Congress was given power to pass laws applicable to those controversies.

In *Gibbons* v. *Ogden,* p. 195, it was held within the power of Congress to regulate those concerns wholly within a State which affect the States generally and which it was necessary to interfere with for the purpose of executing any general power of the government. On this principle it was said, p. 203, *Gibbons* v. *Ogden,* that the legislature of the Union could interfere with and overrule state health and inspection laws wherever necessary for national purposes. See Chief Justice Savage in *Steamboat Co.* v. *Livingston,* 3 Cow. 713, 745.

The power of Congress over land commerce is identical with, and as complete as, its control over water commerce. *The Daniel Ball,* p. 565; *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 341; *California* v. *Cent. Pac. R. R. Co.,* 127 U. S. 1, 39; *In re Debs,* 158 U. S. 564, 589, 591.

The power of Congress incidentally to regulate, where necessary, internal affairs of a State is a doctrine of general application not confined to commerce by water and is based on the necessity for such exercise of power in order

to make effective some grant of power to Congress in the Federal Constitution. *McCulloch* v. *Maryland*, 4 Wheat. p. 426, was planted upon this doctrine and holds that the Federal power modifies, and where necessary may overrule, state power of taxation. In *Southern Railway Company* v. *United States*, 222 U. S. 20, the court rested on the same ground the power of Congress to regulate as to safety appliances all the cars and engines of a railway, including those engaged wholly in commerce within a State, the reason being that such regulation of internal commerce is necessary to make the National power effective. The same principle has been applied to hours of labor of railway employés engaged partly in commerce local within a State. *Baltimore & Ohio R. R. Co.* v. *Int. Comm. Comm.*, 221 U. S. 612; *State* v. *Chi., Mil. & St. P. Ry. Co.*, 136 Wisconsin, 407. The same doctrine was involved in *United States* v. *Coombs*, 12 Pet. 72.

The rule therefore is universal that the powers of Congress extend incidentally to affect the internal affairs of the States and control state power and state action so far as may be necessary to execute at all times and under all conditions every authority vested in Congress by the Constitution.

On this established principle state power to fix local rates is subordinate to the commerce power of Congress; as much subordinate as it is to other provisions of the Federal Constitution, e. g., state power to fix rates is controlled by the Federal prohibition against violation of the obligation of contracts and by the Fourteenth Amendment prohibiting States from taking property without due process of law.

The power of Congress has been executed in some respects fully, in other respects partially, by the Act to Regulate Commerce. The third section prohibits not some but all undue or unreasonable preference or advantage. To this extent it is a complete exercise of the power

vested in Congress and, as before shown, must be held to forbid preference and advantage in favor of local commerce within a State as compared with interstate commerce. This law requires rates to be filed and gives the commission power to fix rates. Such rates are in either case the only lawful rates and no judicial inquiry lies as to their reasonableness. *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426.

If the act of Congress forbids discrimination as between interstate business and business local within a State, collision is established between the state law and the act of Congress. It must be admitted that the power of Congress is paramount and that the state power must give way. *McCulloch* v. *Maryland*, 4 Wheat. 405–6, 426; *Gulf, Col. & Santa Fe Ry. Co.* v. *Hefley*, 158 U. S. 98; *Northern Securities Co.* v. *United States*, 193 U. S. 332, 335, 347; *Gibbons* v. *Ogden*, pp. 195, 209; *License Cases*, 5 How. 574; *Employers' Liability Cases*, 207 U. S. 463.

It appears therefore to be a pure question of fact whether the state rates do destroy, impede or directly operate upon interstate commerce and interstate rates. If they do, the Federal power is shown to be ample to prohibit such interference. *Louis. & Nash. R. R. Co.* v. *Eubank*, 184 U. S. 27.

The argument, that if the state rates are reasonable in and of themselves they cannot be objected to and therefore the whole inquiry is as to their reasonableness, is fallacious. The court determines only whether rates are confiscatory and cannot entertain the broader question of their reasonableness, nor can this be determined by any mathematical formula. Public policy of the Nation may be to permit carriers a large return. Public policy of a State may be to permit but a small one. In such a conflict National authority controls. There being no mathematical measure of reasonableness, Congress has set up a standard—

the published tariff and the findings of the Interstate Commerce Commission. This standard controls commerce among the States and any state rate inconsistent therewith, or destructive thereof, is unreasonable measured by that standard.

In many cases state action has been for the purpose of protecting home industry, of destroying commerce among the States by substituting therefor state commerce, of destroying National regulation by substituting therefor state regulation. See report of Iowa Railroad Commission for year ending December 7, 1909, p. 14; *In Matter of Freight Rates*, 11 I. C. C. 209; *Saunders* v. *Southern Express Co.*, 18 I. C. C. 415; *Meredith* v. *St. Louis Southwestern Ry. Co.*, recently decided by the Interstate Commerce Commission.

The proviso in § 1 of the Interstate Commerce Act, that the act does not apply to transportation wholly within a State, shows that Congress has not exercised its complete power and has intended to leave to the States the regulation of transportation which is wholly, completely and purely internal, but it does not indicate an intention of Congress to exercise less than its full power to prevent discriminations against transportation among the States, less than its complete power to prevent the favoring of any State at the expense of other States and of the country at large. It cannot be read as a grant of power, either to States or to carriers chartered by them, to create against the people of other States and their traffic whatever discrimination a State may choose.

It is not contended that any transportation is free from regulation. In view of the proviso of § 1 of the Commerce Act, the States may fix local rates and prevent discriminations as between them as well as prevent discriminations against local commerce in favor of interstate commerce. State power and state action must give way to whatever extent is necessary to complete an efficient National

control over the subjects committed to that control by the Constitution; that reduction by a State of its domestic rates is permissible until such reduction interferes with interstate rates, or with the free flow of interstate commerce, or with the regulation under congressional authority of commerce among the States, but that the States have no right to reduce their local rates below the interstate rates lawfully established and thus to impede or destroy interstate commerce, or destroy the regulations and rates touching the same as they have been established under National authority.

*Mr. Pierce Butler,* with whom *Mr. Hale Holden, Mr. Jared How* and *Mr. William D. Mitchell* were on the brief, also for appellees:

Appellants' contentions in regard to the valuation of railroad properties are unsound. Appellees contend that the well established principles of law applicable are:

Railroad corporations are persons within the meaning of the Fourteenth Amendment;

Railroad property is private property, subject to public use under just regulations. *Railroad Commission Cases,* 116 U. S. 307, 331; *C., M. & St. P. Ry. Co.* v. *Minnesota,* 134 U. S. 418, 458; *Reagan* v. *Farmers' L. & T. Co.,* 154 U. S. 362, 399, 410; *Int. Com. Comm.* v. *C. G. W. Ry. Co.,* 209 U. S. 108.

The hazards affecting railroad property inhere in the fact that while in a measure such property performs a function of the State there is no guaranty to its owners against loss.

The right to increase in value inheres in the very terms of the constitutional guaranties against taking property without due process of law.

Public grants of lands to railroad companies in Minnesota constitute contracts based upon valuable considerations. *First Div. St. Paul & Pacific R. Co.* v. *Parcher,* 14

Minnesota, 297; *City of St. Paul v. St. Paul & Sioux City Ry. Co.,* 23 Minnesota, 469; *State v. Winona & St. Peter R. R. Co.,* 21 Minnesota, 472; *M. & St. L. R. R. Co. v. Koerner,* 85 Minnesota, 149; *Northern Pacific Ry. Co. v. Townsend,* 190 U. S. 267.

Income derived from the public through rates charged for services rendered belongs to the owners of the property. Under laws requiring the publication of charges, the amounts thereof must be collected and are *prima facie* reasonable. *Willcox v. Consolidated Gas Co.,* 212 U. S. 19; *Brymer v. Butler Water Co.,* 179 Pa. St. 331, 36 Atl. Rep. 249.

There must be a fair return upon the reasonable value of the property at the time it is being used for the public, unless, in exceptional cases, the enforcement of rates necessary for that purpose would be unjust to the public. *Stanislaus County v. San Joaquin Canal Co.,* 192 U. S. 201; *San Diego Land Co. v. Jasper,* 189 U. S. 439; *San Diego Land Co. v. National City,* 174 U. S. 739; *Knoxville v. Water Co.,* 212 U. S. 1; *Willcox v. Consolidated Gas Co.,* 212 U. S. 19; *S. C.,* 157 Fed. Rep. 849; *Mo., Kans. & Tex. Ry. Co. v. Love,* 177 Fed. Rep. 493; *Shepard v. Nor. Pac. Ry. Co.,* 184 Fed. Rep. 765.

The original cost of the property as well as the outstanding capital in stocks and bonds, while admissible in evidence, are matters for consideration only in so far as in the particular case they are competent evidence of present value.

Where original cost or outstanding capital have appeared to be in excess of present value the courts have declined to determine the validity of rates upon either as a basis of value. *Smyth v. Ames,* 169 U. S. 546; *San Diego Land Co. Cases, supra.*

The general rule is that where the property has been efficiently located, constructed and maintained and results of operation as a whole show volume of traffic and

earnings sufficient to support the property, pay reasonable dividends and leave something in addition, the true value is in excess of the mere cost of reproduction of the physical or tangible property. Cases *supra*, and *A., T. & S. F. Ry. Co.* v. *Sullivan*, 173 Fed. Rep. 456; *M., K. & T. Ry. Co.* v. *Love*, 177 Fed. Rep. 493; *Waterworks Co.* v. *Kansas City*, 62 Fed. Rep. 853, 864; *Southern Pac. Co.* v. *Bartine*, 170 Fed. Rep. 725, 751; *Metropolitan Trust Co.* v. *Houston & Tex. Cent. Ry. Co.*, 90 Fed. Rep. 683; *Spring Valley Waterworks* v. *San Francisco*, 124 Fed. Rep. 574, 594; *Kennebec Water District* v. *Waterville*, 97 Maine, 185; *Water District* v. *Water Co.*, 99 Maine, 371; *Proposed Advance in Freight Rates*, 9 I. C. C. 402; *Ames* v. *Railroad*, 64 Fed. Rep. 165; *Cotting* v. *Kansas City Stock Yards*, 82 Fed. Rep. 850; *S. C.*, 183 U. S. 79, 91.

Cost of reproduction of the tangible property is an element of prime importance in determining present value.

A carrier owning property which is valuable for railroad terminals has in law the right to the full and true value of them as measured by every legitimate standard—generally for any and all uses for which it might be suited. *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19; *Boom Co.* v. *Patterson*, 98 U. S. 403.

Railroad utility is a higher use than ordinary business, residence or farm use and makes for higher cost and therefore higher value. Vol. 10, Nor. Pac. Exam. Morgan Nor. Pac.

As to operating expenses:

The intrastate rates fixed by the Commission cannot be sustained, on the ground that the earnings from all business—interstate and intrastate—in the State are sufficient. That ground cannot be sustained.

It is necessary to take into account the cost of doing the business covered by the rates complained of.

Intrastate business, both freight and passenger, has

been found in all the reported cases to have been attended by much higher cost than corresponding interstate business.

The cost of intrastate business may be indicated:

By the relation of the cost of the intrastate unit (the ton mile or the passenger mile) to the cost of the corresponding interstate unit.

By the relation of the cost of the intrastate business in proportion to revenue derived therefrom to the cost of the corresponding interstate business in proportion to revenue derived therefrom, i. e., the cost to earn a dollar in the one class to the cost to earn a dollar in the other.

The relation of the cost of the intrastate business in proportion to revenue derived therefrom to the cost of all business on the system—or within the State—in proportion to the revenue derived therefrom.

The revenue derived from the intrastate business must be found and compared with the cost thereof.

The exact cost of doing either class of business, either intrastate or interstate, has never been kept by any railroad company. There is no recognized method for the keeping of such cost in railroad accounts, or for its ascertainment with mathematical exactness.

The courts and men experienced in such matters agree that, while the exact cost of doing either of such classes of business cannot be shown, the opinions of experts, familiar with conditions bearing upon the relation of cost of the intrastate business to that of the interstate business, furnish the only guide for such determination.

In all reported cases it has been found that it costs substantially more to earn a dollar in the intrastate than in the corresponding interstate business—and very much more to produce a ton-mile in the intrastate freight business than in the interstate freight business.

That the cost to produce a ton-mile (where the relation of cost is expressed on that basis) has never been found to

be less than two and one-half times as much in the intrastate business as in the interstate business.

Neither the "straight ton-mile basis" or the "straight revenue basis" has ever been found to fairly divide freight operating expenses between the intrastate business and the interstate business, because the intrastate business costs more per ton per mile and has always been found to cost more in proportion to revenue than in the corresponding interstate business.

In all cases a fair division of freight operating expenses may be made between intrastate business and interstate business on either the "Equated Ton-Mile Basis" or the "Equated Revenue Basis," as found and used by the master. Each basis may be expressed in terms of the other and the result is the same whether one or the other is used.

It costs more to produce an intrastate passenger mile than an interstate passenger mile, but such proportion of extra cost is usually, if not always, less in the passenger department than the corresponding extra cost of producing an intrastate ton-mile in the freight department.

Passenger operating expenses may fairly be divided between intrastate business and interstate business on the "Equated Passenger Mile Basis" or the "Equated Revenue Basis" as found and employed by the Master in these cases.

The value of services rendered the public is greater than the rates therefor in effect immediately before the making of the orders and laws complained of.

Rates have been reduced greatly from time to time. The cost of other service and of commodities generally—especially of labor and supplies required to operate railroads—has advanced greatly during recent years.

A rate of return to be reasonably adequate must be higher than seven per cent upon the value of the property used, at the time it is used, to render the service covered by the rates.

As to fair returns from banks, railroads, and public utility corporations, etc., see *Willcox* v. *Consolidated Gas Co.,* 212 U. S. 19; *Ames* v. *Union Pacific R. R. Co.,* 64 Fed. Rep. 165, 186, 187; *Pennsylvania R. R. Co.* v. *Philadelphia County,* 68 Atl. Rep. 676; *Brymer* v. *Butler Water Co.,* 179 Pa. St. 331, *S. C.,* 36 Atl. Rep. 249, 36 L. R. A. 250; *Spokane* v. *Northern Pacific Ry. Co.,* 15 I. C. C. 417; Report Railroad Securities Commission, under § 16 of the act of June 18, 1911; *M., K. & T. Ry. Co.* v. *Love,* 177 Fed. Rep. 493, 501, and numerous cases cited in the opinion of the court below.

*Mr. W. P. Clough* filed a brief in behalf of the Northern Pacific Railway Company and the Great Northern Railway Company, appellees.

*Mr. Edmund S. Durment,* by leave of the court, filed a brief as *amicus curiæ.*

MR. JUSTICE HUGHES delivered the opinion of the court.

These suits were brought by stockholders of the Northern Pacific Railway Company, the Great Northern Railway Company and the Minneapolis and St. Louis Railroad Company, respectively, to restrain the enforcement of two orders of the Railroad and Warehouse Commission of the State of Minnesota and two acts of the legislature of that State prescribing maximum charges for transportation of freight and passengers, and to prevent the adoption or maintenance of these rates by the railroad companies. In addition to the companies, the Attorney-General of the State, the members of the Railroad and Warehouse Commission, and also, in the cases of the Northern Pacific and Great Northern companies, certain representative shippers, were made defendants.

The order and acts, which by their terms related solely to charges for intrastate transportation, were as follows:

(1) The Commission's order of September 6, 1906, effective November 15, 1906, fixing the maximum class rates for general merchandise.

(2) The act, approved April 4, 1907, to take effect May 1, 1907, prescribing two cents a mile as the maximum fare for passengers, except for those under twelve years of age, for whom the maximum rate was to be one cent a mile. (Laws of 1907, c. 97.)

(3) The act, approved April 18, 1907, to take effect June 1, 1907, fixing maximum commodity rates for car-load lots of specified weights. (Laws of 1907, chap. 232.)

(4) The Commission's order of May 3, 1907, effective June 3, 1907, establishing maximum "in-rates" for designated commodities in carload lots from St. Paul, Minneapolis, Minnesota Transfer and Duluth to certain distributing centers. (No complaint is made of this order in the case of the Minneapolis and St. Louis Railroad Company.)

In 1905, the legislature of Minnesota had adopted a joint resolution directing the Commission "to undertake the work of securing a readjustment of the existing freight rates in this State, which will give a more uniform system of rates throughout the State and a uniform scale of percentages which each class rate shall bear to the first class, the readjustment to secure a substantial reduction in the existing merchandise rates." (Laws of 1905, c. 350, p. 631.) Pursuant to this direction, the Commission conducted a prolonged investigation. Public hearings were held extending over several months in which the railroad companies took an active part, submitting a large amount of testimony with respect to the matters involved. The Commission found the existing class rates for general merchandise to be unreasonable and by the order of September 6, 1906, above mentioned, established

a new schedule of lower maximum rates. These rates were applied to the classes shown by the so-called "Western Classification" between stations in the State. This was a classification, by which articles were arranged in groups with reference to their general character, value and the cost of transportation, and with modifications made from time to time; it had long been used by common carriers in the west and northwest as a basis for rates, the commodities of each class taking the same rate under like conditions. In Minnesota, however, a large number of commodities, amounting to several hundred, had, by the intervention of the Commission, been removed from this classification by the application of special rates known as "commodity rates" or reduced in class so that the Western Classification in operation in that State was very materially different from that in general use as a basis of rates in other States.

The schedule of rates set forth in the order of September 6, was such that each rate for each class bore an exact relation to each other rate. The plan of the schedule was this: For first-class merchandise an allowance of 11.02 cents per cwt., was made for terminal charges and in addition, there was permitted a hauling charge of .98 of a cent for each five miles up to 200 miles, for each ten miles over 200 miles up to 400 miles, and for each twenty miles over 400 miles up to 500 miles. For other classes, the rates were a fixed per centum of the corresponding rates for the first class. These rates were maximum terminal rates; that is, they related to transportation to or from certain important stations called terminal or distributing stations. Between stations neither of which is so designated the rates of the schedule might be increased by five per centum.

The railway companies complied with this order and the class rates were put into effect on November 15, 1906.

The Commission also had under consideration a reduction in the commodity rates, at which certain commodities

such as grain, coal, lumber, and live stock were moved in carload lots. Because of the agitation with respect to these charges, the railroad companies voluntarily reduced their rates about ten per cent. on grain (September 1, 1906) and coal (October 22, 1906). The Commission, however, on December 14, 1906, ordered a further reduction in the commodity rates. The railroad companies brought suit in the Circuit Court of the United States and obtained a temporary injunction restraining the enforcement of this order. Thereupon the legislature passed the act above mentioned, approved April 18, 1907, which established a new schedule of maximum commodity rates in all respects like that fixed by the Commission save that the reduction was not so great. The act grouped the various commodities which it embraced in several classes, for which different rates were prescribed. There was no fixed percentage relation between the classes and no regular rate of progression of the various charges with increasing distance. In other respects the method of making the schedules was similar to that adopted in the order of September 6, 1906, the hauling charge decreasing as the mileage increases.

The remaining action with respect to freight rates was taken by the Commission in the order of May 3, 1907, for the purpose of securing more favorable in-rates to a number of minor jobbing centers. It applied to certain commodities, such as groceries in carload lots, and was supplemental to the order of September 6, 1906, being intended to reëstablish the relation which had previously existed between the in-rates to these distributing points and the general schedule of class rates.

The railroad companies obeyed this order of May 3, 1907, as they had that of September 6, 1906, and they also put into effect the passenger rate of two cents a mile. They were about to adopt the commodity rates fixed by the act of April 18, 1907, when these suits were brought and a

temporary injunction restrained them from taking that course. The other rates, that is, the class rates, special in-rates and the passenger rates were permitted to remain in force pending the suits.

The complainants assailed the acts and orders upon the grounds (1) that they amounted to an unconstitutional interference with interstate commerce, (2) that they were confiscatory and (3) that the penalties imposed for their violation were so severe as to result in a denial of the equal protection of the laws and a deprivation of property without due process of law. The jurisdiction of the Circuit Court was sustained in *Ex parte Young*, 209 U. S. 123, where it was also held that the penal provisions of the acts, operating to preclude a fair opportunity to test their validity, were unconstitutional on their face. The Circuit Court then referred the suits to a special master, who took the evidence and made an elaborate report sustaining the complainants' contentions. His findings were confirmed by the court and decrees were entered accordingly, adjudging the acts and orders (with the exception, in the case of the Minneapolis and St. Louis Railroad Company, of the order of May 3, 1907) to be void and permanently enjoining the enforcement of the prescribed rates, freight and passenger, and their adoption or maintenance by the railroad companies. 184 Fed. Rep. 765.

From these decrees, the Attorney-General of the State and the members of the Railroad and Warehouse Commission prosecute these appeals.

The penal provisions being separable (*Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, 395; *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19, 53, 54; *Grenada Lumber Co.* v. *Mississippi*, 217 U. S. 433, 443; *West. Un. Tel. Co.* v. *Richmond*, 224 U. S. 160, 172), the question of the validity of the acts and orders fixing maximum rates is presented in two distinct aspects, (1) with respect to their

effect on interstate commerce, and (2) as to their alleged confiscatory character.

*First. As to interference with interstate commerce.*

None of the acts and orders prescribes rates for goods or persons moving in interstate commerce. By their terms, they apply solely to commerce that is internal. Despite this obvious purport it has been found below that the inevitable effect of the State's requirements for intrastate transportation was to impose a direct burden upon interstate commerce and to create unjust discriminations between localities in Minnesota and those in adjoining States; and hence that they must fall as repugnant to the commerce clause and to the action of Congress under it. To support its conclusion, the Circuit Court presents an impressive array of facts drawn from the approved findings of the master. (184 Fed. Rep. 775–792.) Without giving all the details they embrace, these findings may be summarized as follows:

I. The railroad property of each of the three companies constitutes a single system. On June 30, 1906, the Northern Pacific Railway Company (a Wisconsin corporation) operated 7,695 miles of track, of which 1,625 miles were in Minnesota. The Great Northern Railway Company (a Minnesota corporation) at the same time operated 8,528 miles of track, of which 2,779 miles were in Minnesota. Their lines extend westerly from Superior, Wisconsin, and Duluth, Minnesota, and from St. Paul and Minneapolis, through the States of Minnesota, North Dakota, Montana, Idaho, Washington and Oregon, to the Pacific Coast. The Minneapolis and St. Louis Railroad Company (also a Minnesota corporation) operated 1,028 miles of track running from St. Paul and Minneapolis westerly and southerly to points in South Dakota and Iowa. In the case of each company, the movement of interstate and local traffic takes place at the same time, on the same rails, with the same employés, and largely

by means of the same trains and cars. There has never been a separation, and it is impracticable in the exercise of fair economy to make a separation, between the interstate and intrastate business in the case either of freight or of passengers. By far the larger part of the traffic is interstate. In the year 1906 the freight business of the Northern Pacific Company, local to Minnesota, was 2.67 per cent. of its entire freight business and 12.33 per cent. of its freight business touching the State, and its passenger business local to the State was 5.79 per cent. of its entire passenger business and 67.21 per cent. of its passenger business touching the State.

The conditions attending the transportation of passengers and freight are substantially the same for like distances within those portions of the States of Wisconsin, Minnesota, North Dakota and South Dakota reached by the lines of these companies, whether the transportation is interstate or wholly intrastate. Prior to the acts and orders in question, the companies had maintained rates which were relatively fair and not discriminatory as between interstate and intrastate business; and it is concluded that any substantial change in the basis of rates thus established due only to the fact that the transportation was interstate or was local to a State, and any substantial difference in rates as between the two sorts of traffic, would constitute unjust discrimination in fact.

II. The state line of Minnesota on the east and west runs between cities which are in close proximity. Superior, Wisconsin, and Duluth, Minnesota, are side by side at the extremity of Lake Superior. Opposite one another, on the western boundary of the State, lie Grand Forks, North Dakota, and East Grand Forks, Minnesota; Fargo, North Dakota, and Moorhead, Minnesota; and Wahpeton, North Dakota, and Breckenridge, Minnesota. The cities in each pair ship and receive, to and from the same localities, the same kinds of freight. The railroad com-

panies have always put each on a parity with the other in the matter of rates, and if there were a substantial difference it would cause serious injury to the commerce of the city having, the higher rate. If the Northern Pacific Company failed to maintain as low rates on traffic in and out of Superior as on that to and from Duluth, its power to transact interstate business between Superior and points in Minnesota would be seriously impaired and the value of its property in Superior would be depreciated.

The maximum class rates fixed by the order of September 6, 1906, were from 20 per cent. to 25 per cent. lower than those theretofore maintained by the Northern Pacific and Great Northern Companies for transportation in Wisconsin, Minnesota and North Dakota, whether such transportation was local to one of these States or was interstate between any two of them. When the Northern Pacific Company, pursuant to this order, installed the new intrastate rates, it reduced its interstate rates between Superior and points in Minnesota to an exact parity with its rates from Duluth. Reduction was also made in the rates between both Duluth and Superior and the above-mentioned points on the western boundary so as to put the border cities in North Dakota on an equal basis with the neighboring cities in Minnesota. This reduction was substantial and, had it not been made, the places adjoining the boundary, but outside the State, could not have competed with those within. Although the Northern Pacific Company thereby suffered a substantial loss in revenue from its interstate business, it had the choice of submitting to that loss or suffering substantial destruction of its interstate commerce to these border localities in articles covered by the orders. At the same time, the Great Northern Company made similar reductions, although, in its case, the transportation between Duluth and points in Minnesota was interstate—its line passing through Wisconsin. The reason for these reductions was

to preserve the relation in rates from Duluth which had always existed between localities on the Great Northern line and those similarly situated on the line of the Northern Pacific, and to meet the reduced rates on the latter.

III. Moorhead, Minnesota, Fargo and Bismarck, North Dakota, Billings and Butte, Montana, are so-called jobbing centers. Rates had always been accorded to them by the Northern Pacific Company which would allow them to compete with their nearest neighbors and with St. Paul, Minneapolis and Duluth. The order of September 6, 1906, as supplemented by that of May 3, 1907, substantially reduced carload rates from the eastern terminals to Moorhead. This reduction would have given Moorhead an advantage in territory accessible to its jobbing industry not only as against Fargo, unless carload rates to Fargo were similarly reduced, but also as against Duluth, St. Paul and Minneapolis unless less-than-carload rates from these places to points accessible to Moorhead, which included a considerable territory in North Dakota, were proportionately reduced. If Fargo were protected as against Moorhead, it would have an advantage over Bismarck in territory common to them both and an advantage over the eastern terminals in territory common to them and to Fargo, unless carload rates from the eastern terminals to Bismarck and less-than-carload rates from those terminals to the territory accessible to Fargo were correspondingly reduced; and so on from distributing point to distributing point.

IV. Every rate comprehends two terminal charges, the initial and the final, and a haulage charge. It is declared to be a cardinal principle of rate-making that a rate for a longer distance should be proportionately smaller than one for a shorter distance; for even if the haulage charge in the former case were the same per mile, the rate per ton per mile should be less for the longer haul, as the terminal charges would be spread over a greater distance.

A comparison disclosed that the rates established by the order of September 6, 1906, and maintained by the Northern Pacific Company between St. Paul and Moorhead were in general substantially less than the proportion of the interstate rates maintained by the company to various points in North Dakota and Montana, based on the mileage in Minnesota as compared to that of the entire haul. Maintaining such a relation of rates involves, it is found, substantial and unjust discrimination in fact against the interstate localities.

V. After the installation by the Great Northern and Northern Pacific Companies of the rates prescribed by the order of September 6, 1906, it appeared that the sum of the local rates from St. Paul to Moorhead and from Moorhead to many points in North Dakota was less than the interstate rates theretofore maintained from St. Paul to these points. Both companies thereupon established rates from St. Paul to the North Dakota points as a rule no greater than the sum of the locals on Moorhead but substantially lower in general than the interstate rates in force when the order took effect. Maintaining interstate rates from St. Paul to North Dakota localities substantially greater than the sum of the locals based on the state line would have caused unjust discrimination in fact. The actual reason for the reduction in the interstate rates was to prevent transshipment at Moorhead in order to take advantage of the lower sum of the locals and to retain on its line traffic which might reach Moorhead over other lines by reason of competition, and, as to less-than-carload lots, to enable jobbers in the Twin Cities and Duluth to compete with those in Moorhead and Fargo in territory which otherwise the latter would have exclusively occupied by reason of their closer proximity.

VI. It is further held to be one of the fundamental dogmas of rate-making that the haulage charge per mile should not increase with increasing distance if the condi-

tions be the same.   Under the progressive decrease in the haulage charge within the State, provided by the order of September 6, 1906, 100 pounds of merchandise transported by the Northern Pacific from St. Paul to Moorhead, 248 miles, would have been hauled for 48 miles, at the rate of .98 cents per ten miles, when Moorhead is reached.   If the same haulage charge of .98 cents per ten miles were applied for the remaining distance to Spokane, 1,510 miles from St. Paul, (which is said to be taken as a fair example merely to illustrate the principle), it would produce a rate from St. Paul to Spokane on first-class merchandise of $1.79 per cwt.   The Interstate Commerce Commission in the Spokane rate case fixed the reasonable rate on first-class merchandise from St. Paul to Spokane of $2.50 per cwt.   Maintaining this rate and the state schedule in Minnesota at the same time necessarily involves the raising of the per mile haulage charge after the Minnesota state line has been crossed, or the charge of a higher rate within Minnesota for its mileage proportion of long-haul interstate business than for business local to the State which is carried under the same conditions, and hence is found to result in unjust discrimination in fact against localities west of the Minnesota line.

VII.  For more than twenty-five years the Northern Pacific Company has maintained an equal basis of rates on merchandise between its eastern and western terminals respectively and Butte, Montana, and between its eastern and western terminals respectively and localities intermediate between them and Butte.   Other railroads reaching Butte have during the same time maintained like rates to Butte from Sioux City, Omaha, St. Joseph and Kansas City on the east, and from San Francisco, Sacramento and Los Angeles on the west.   Butte has been as the hub of a wheel with spokes representing equal rates to these various cities.   Industries, it is said, have been born and have grown in reliance upon this parity of rates.

Intermediate points have had rates fixed in proportion to the Butte rates. Competition of markets and of carriers. has brought this about. The Northern Pacific Company cannot maintain the state rates between its eastern terminals and Moorhead and at the same time its interstate rates from its eastern terminals to Butte without substantial discrimination in fact against Butte or localities intermediate between its eastern terminals and Butte. If it lowers its rates from its eastern terminals to Butte and intermediate stations to such an extent as to obviate this discrimination, it must, to preserve the relation which has always existed, lower to a like extent its rates from its western terminals to Butte and intermediate stations. Consequently, it is found that if the Northern Pacific Company maintains the commission-made rates between its eastern terminals and Moorhead it must either substantially discriminate in fact or destroy the general relation of rates which has existed for many years in the territory between the Missouri River and the Pacific Coast.

VIII. Prior to the taking effect of the order of September 6, 1906, the Great Northern and Northern Pacific Companies had established joint through rates in connection with other carriers from all localities east or south of Minnesota to all points in Minnesota west of St. Paul and Minneapolis. After the rates prescribed by this order were installed, the sum of the locals on St. Paul from all localities south and east of Minnesota to points in Minnesota west of St. Paul and Minneapolis, was substantially less than the then existing interstate rates for the through haul to such western points. To avoid the resulting discrimination in favor of St. Paul, the companies withdrew the existing interstate rates and established a new tariff no higher than the sum of the locals on St. Paul.

IX. Further illustrations are given of inequalities resulting from the reduced Minnesota rates as compared

with rates for like transportation under similar conditions
into adjoining States, as, for example, from Moorhead
easterly to Minnesota points and westerly into North
Dakota, and also of the effects produced in the application
of the state rates by reason of the difference in the dis-
tances from St. Paul at which the state line is reached on
similar hauls over different lines.  As the schedule of
September 6, 1906, prescribes a fixed relation between
rates for different distances and different classes, the con-
clusion is that if the rule must be adhered to in Minnesota,
it cannot be departed from substantially because of the
intervention of a state line at one distance or another
without involving unjust discrimination in fact.

It is found further that while, after the order of
September 6, 1906, became effective, both the Great
Northern and the Northern Pacific Companies reduced
certain interstate rates, as already mentioned, the re-
duction was not to such extent as to remedy the discrim-
ination resulting from the fact that in most cases the gen-
eral basis of rates within Minnesota was substantially
lower than that maintained in North Dakota or upon
traffic crossing the state line.

X. The similarity in the conditions of interstate and
intrastate transportation is found also with respect to
the commodities for which rates were prescribed by
the act of April 18, 1907 (c. 232).  The main lines
and branches of the Northern Pacific and Great Northern
Companies within Minnesota and North Dakota, with
the exception of certain limited tracts, lie within grain
fields, and grain is shipped in substantial quantities from
nearly all stations in these fields to Duluth, Minneapolis
and Superior.  Shipments of coal originate at the head
of the Lakes—that is, at Duluth or Superior—and find
their destination at all localities served by the companies
in Minnesota and eastern North Dakota.  Shipments of
lumber originate at Duluth, Cloquet, Little Falls and other

places in Minnesota, and are destined to points throughout Minnesota and North Dakota. Shipments of live stock are made in Minnesota, South Dakota and eastern Montana and go to South St. Paul or Chicago. So far as the conditions of transportation are concerned, it matters not, as to commodities moving eastwardly, whether the shipment is made in Montana, North Dakota or Minnesota or the transportation ends in Minnesota or in Wisconsin, and, as to commodities moving westwardly, whether the shipments are from Minnesota points or from Superior or whether they find their destination in Minnesota or in North Dakota. The conclusion is that to maintain the commodity rates for transportation wholly within Minnesota simultaneously with the interstate rates now in force would involve unjust discrimination and would seriously impair the interstate business of the companies, to avoid which it would be necessary to reduce the basis of the interstate rates to a substantial parity with that prescribed by the state law. It is also stated that if the rates fixed by chapter 232 of the Laws of 1907 should become effective, the rate on shipments of wheat, with milling-in-transit privileges, from points in Minnesota via Minneapolis to Chicago, would be automatically reduced and that unless all interstate rates between Minnesota points and Chicago via interior mill towns with similar privileges should be correspondingly reduced, Minneapolis would have a substantial advantage over such towns in its interstate rates.

XI. Prior to the act of 1907, fixing the rate of two cents a mile, the general basis of rates for passengers (of 12 years of age or over) between any two points on the Northern Pacific system, had been for some years three cents a mile. After the new state rate had been installed, the sum of the locals between Moorhead and other Minnesota points and Moorhead and points westerly thereof was less than the then-existing through interstate rates. The passenger

fare act took effect May 1, 1907, and in the first month thereafter the revenue from passengers on the Northern Pacific line between Moorhead and other Minnesota points increased 647 per cent. over that of the corresponding month of the preceding year, while, eliminating Moorhead business, the revenue from passenger business within the State decreased two per cent. In June, 1907, the second month, there were sold by the Northern Pacific Company, 4,037 tickets between St. Paul or Minneapolis, on the one hand, and Moorhead or East Grand Forks on the other, as compared with only 172 such tickets in the corresponding month of the year before; and in June, 1907, there were sold only 173 tickets between St. Paul or Minneapolis, and Grand Forks and Fargo, as compared with 984 such tickets in the corresponding month of the previous year. In May and June, 1906, only one cash full fare was collected on a train from Moorhead to St. Paul or Minneapolis. In those months in 1907 there were 1,168 cash full fares and 82 cash half fares so collected. Hence, it is said, the necessary, immediate and direct effect of the law was to deprive the Northern Pacific Company of a substantial amount of its interstate passenger business through Moorhead.

Notwithstanding the facility with which interstate passengers could avoid the discrimination against them by making two contracts with the company, it is found that discrimination in fact still existed against the interstate passenger who applying for a through ticket did not know that the sum of the locals on Moorhead was less than the through rate, against the passenger with a trunk which he could not check through unless on a through ticket, and against a passenger who was compelled to use a sleeping car. The Northern Pacific Company shortly remedied this discrimination by reducing all its interstate fares for passenger transportation through Moorhead to an amount no greater than the sum of the locals over

Moorhead.   Before this reduction Wisconsin had fixed
the maximum passenger fare at two cents a mile, and
North Dakota at two and one-half cents a mile.   The
rates thereafter established by the Northern Pacific Com-
pany between St. Paul, for example, and points in North
Dakota and beyond, and by the Northern Pacific Com-
pany jointly with other companies for transportation be-
tween points easterly of Minnesota and points on the
line of the Northern Pacific, were in general less than the
previous rates by approximately one cent per mile for the
mileage in Wisconsin and Minnesota, and by one-half cent
per mile for the mileage in North Dakota.   It is concluded
that these reductions were compelled to avoid unjust
discrimination and in order that the companies might
transact interstate passenger business freely and without
impairment of volume.

There are added various hypothetical calculations of
the losses which would have been sustained if the basis
prescribed by the state acts and orders had been applied
to the interstate business and to local business in other
States.   We shall have occasion later to refer to the actual
results of the business of the railroad companies during
the time that the rates fixed by the acts and orders (with
the exception of the commodity rates) were in force, and
to the effect upon revenue which the adoption of the com-
modity rates would have had.

The foregoing findings, as stated by the Master, were
made "without regard to the justness or otherwise in fact
of the interstate rates so affected by such local rates."
The determination of the reasonableness of the interstate
rates was not deemed to be within the province of the
court.

The appellants do not concede the correctness of the
findings in their full scope and insist upon qualifications.
They deny that the evidence justified the finding that the

companies had maintained "an equable, that is, relatively
fair basis of rates" prior to the acts and orders in question.
The general or comprehensive system of interdependent
and fairly related rates, each so equitably adjusted to the
others that any local change must of necessity throw the
whole out of balance, is declared to exist only in imagina-
tion—to be a fiction constructed in disregard of the facts
of rate-making and without attention to the inconsist-
encies shown by the schedules which had been in force.
The actual reductions in interstate rates, which followed
upon the adoption of the state tariffs, were made, it is
urged, in rates voluntarily established by the companies
themselves which had not been declared to be reasonable
by competent authority and in any case furnish no stand-
ard by which the validity of the action of the State, in
the control of its internal affairs, should be judged.    The
appellants say that the local rates in Minnesota were
incongruous and unreasonable; that frequent changes in
the interest of favored shippers had been made through
the filing of temporary intrastate tariffs until the practice
was stopped by a statute of 1905 (Chapter 176) forbidding
changes without the consent of the Commission; that with
respect to grain and live stock, the principal agricultural
products of the State, the companies maintained an
"inharmonious jumble of arbitrary rates;" and that the
acts and orders in question were designed to correct in-
equalities in the intrastate tariffs and to prescribe charges
which, upon thorough investigation and after public
hearings in which the companies participated, were found
to be reasonable and were brought into suitable relation
with each other by means of a scientific plan.    And it is
denied that unjust discrimination as against localities
without the State can be predicated of the establishment
of reasonable state rates.

It is also insisted that the prescribed intrastate freight
rates were not in general lower than the existing interstate

rates. Reference is made to the long-distance traffic which, it is said, was moved within the State on proportionals of long-haul rates which were much below the local rates fixed by the State. It is pointed out that the Master found, in passing upon the question whether the rates were confiscatory, that the gross revenue which was derived from the intrastate freight business during the fiscal year ending June 30, 1908, (when all the rates in question were in force save the commodity rates), was greater per ton-mile than that derived in the same period from the interstate business within the State, being in the case of the Northern Pacific Company in the ratio of 1.4387 to 1 and in that of the Great Northern Company of 2.02894 to 1. The appellants also contest the validity of the argument based on an hypothetical extension beyond the state line of the "rate of progression" for additional distance which had been prescribed by the State solely with reference to internal traffic, and they submit illustrations of incongruities which they contend would be shown by a similar extension of the rate of progression disclosed by the former intrastate tariffs of the companies. Again, it is urged that the extent of the reductions attributable to the two-cent fare law may not be estimated properly by a comparison with the former maximum rate of three cents a mile. Various rates had been in force less than the maximum allowed. For the six years prior to the two-cent fare law the average rate per passenger per mile for intrastate transportation in Minnesota, on the Northern Pacific line, had ranged from 2.299 cents in 1901 to 2.435 cents in 1905, 2.406 cents in 1906, and 2.197 cents in 1907; [1] and during the same time the average rate per passenger per mile for interstate transportation in Minnesota varied from 2.075 cents in 1901, 2.027 cents in 1905, 1.949 cents in 1906, and 1.981 cents in 1907. [1] In the fiscal year ending

_____

[1] The two-cent fare law was in force for two months of the fiscal year ending June 30, 1907.

June 30, 1908, with the two-cent fare·law in force, the average rate per passenger per mile in Minnesota was 1.930 cents for intrastate and 1.928 cents for interstate carriage.

It is conceded, however, that the schedules fixed for intrastate transportation "necessarily disturbed the equilibrium theretofore existing between the rates on the two classes of business" (state and interstate) "on the boundary. lines." This applies to the rates to and from the cities situated on opposite sides of the Red River of the North, the boundary between Minnesota and North Dakota, and to and from Duluth and Superior on the eastern boundary. The reduction of the state rates brought them below the level of the interstate rates in those instances in which formerly both had been maintained on a parity. So also, whatever may be said as to the non-existence of a general or comprehensive system of equitably adjusted rates, it is clear that there are competitive areas crossed by the state line of Minnesota and that the State's requirements altered the existing relation between state and interstate rates as to places within these zones of competition and not merely as to the cities on the boundary of the State.

The situation is not peculiar to Minnesota. The same question has been presented by the appeals, now before the court, which involve the validity of intrastate tariffs fixed by Missouri, Arkansas, Kentucky and Oregon. Differences in particular facts appear, but they cannot be regarded as controlling. A scheme of state rates framed to avoid discrimination between localities within the State, and to provide an harmonious system for intrastate transportation throughout the State, naturally would embrace those places within the State which are on or near the State's boundaries; and, when these are included in a general reduction of intrastate rates, there is, of course, a change in the relation of rates as theretofore existing to

points adjacent to, but across, the state line. Kansas City, Kansas, and Kansas City, Missouri; East St. Louis, Illinois, and St. Louis, Missouri; Omaha, Nebraska; and Council Bluffs, Iowa; Cincinnati, Ohio, and Covington and Newport, Kentucky; and many other places throughout the country which might be mentioned, present substantially the same conditions as those here appearing with respect to localities on the boundaries of Minnesota. It is also a matter of common knowledge that competition takes but little account of state lines and in every part of the land competitive districts embrace points in different States.

With appreciation of the gravity of the controversy, the Railroad Commissioners of eight States [1] have filed their brief as *amici curiæ*, in support of the appeals, stating that, if the doctrine of the court below were accepted, the regulation by the States of rates for intrastate transportation would be practically destroyed. They say that "there is practically no movement of traffic between two towns within a State that does not come into competition with some interstate haul," and that "if the disturbance of the existing relation between competitive state and interstate rates is the correct criterion, no reduction can be made in state rates without interfering with interstate commerce." The Governors of three States, pursuant to a resolution of a conference of the Governors of all the States, have also presented, by leave of the court, their argument in defense of the position taken by Minnesota. They do not seek "to belittle the effect of the action of Minnesota on the business between the places" named in the findings, but they are convinced that if the principle announced by the Circuit Court is upheld, it can be made to apply by a showing of similar facts in virtually every State. Insisting that, under their reserved power, "the

---

[1] Nebraska, Iowa, Kansas, South Dakota, North Dakota, Oklahoma, Missouri and Texas.

right of the States to regulate their own commerce is as clear and broad as that of Congress to regulate interstate commerce," they assail the decision below, not upon the ground that it incorrectly sets forth conditions in Minnesota and adjoining States, but for what they consider to be "its plain disregard of the provisions of the Federal Constitution, which establish the relations between the Nation and the States." "The operation of these provisions," they maintain, "was not made to depend on geography or convenience or competition. They cannot apply in one State and not in another, according to circumstances as they may be found by the courts, because they are vital principles which constitute the very structure of our dual form of government."

The controversy thus arises from opposing conceptions of the fundamental law, and of the scope and effect of Federal legislation, rather than from differences with respect to the salient facts.

For the purpose of the present inquiry, the rates fixed by the State must be assumed to be reasonable rates so far as intrastate traffic is concerned; that is, they must be taken to be rates which the State, in the exercise of its legislative judgment, could constitutionally fix for intrastate transportation separately considered. If the state rates are not of this character—a question to be dealt with later—they cannot be sustained in any event; but, assuming them to be otherwise valid, the decree below, with respect to the present branch of the case, rests upon two grounds: (1) That the action of the State imposes a direct burden upon interstate commerce; and (2) that it is in conflict with the provisions of the Act to Regulate Commerce.

These grounds are distinct. If a state enactment imposes a *direct burden* upon interstate commerce, it must fall regardless of Federal legislation. The point of such

an objection is not that Congress has acted, but that the State has directly restrained that which in the absence of Federal regulation should be free. If the acts of Minnesota constitute a direct burden upon interstate commerce, they would be invalid without regard to the exercise of Federal authority touching the interstate rates said to be affected. On the other hand, if the State, in the absence of Federal legislation, would have had the power to prescribe the rates here assailed, the question remains whether its action is void as being repugnant to the statute which Congress has enacted.

Prior to the passage of the Act to Regulate Commerce, carriers fixed their interstate rates free from the actual exertion of Federal control; and under that act, as it stood until the amendment of June 29, 1906, 34 Stat. 584, c. 3591, the Interstate Commerce Commission had no power to prescribe interstate rates. *Interstate Commerce Commission* v. *C., N. O. & T. P. Ry. Co.*, 167 U. S. 479, 511. The States, however, had long exercised the power to establish maximum rates for intrastate transportation. Was this power, apart from Federal action, subject to the limitation that the State could not fix intrastate rates, reasonable as such, generally throughout the State, but only as to such places and in such circumstances that the interstate business of the carriers would not be thereby affected? That is, was the State debarred from fixing reasonable rates on traffic, wholly internal, as to all state points so situated that as a practical consequence the carriers would have to reduce the rates they had made to competing points without the State, in order to maintain the volume of their interstate business or to continue the parity of rates or the relation between rates as it had previously existed? Was the State, in prescribing a general tariff of reasonable intrastate rates otherwise within its authority bound not to go below a minimum standard established by the interstate rates made by the

carriers within competitive districts? If the state power, independently of Federal legislation, is thus limited, the inquiry need proceed no further. Otherwise it must be determined whether Congress has so acted as to create such a restriction upon the state authority theretofore existing.

(1.) The general principles governing the exercise of state authority when interstate commerce is affected are well established. The power of Congress to regulate commerce among the several States is supreme and plenary. It is "complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution." *Gibbons* v. *Ogden,* 9 Wheat. 1, 196. The conviction of its necessity sprang from the disastrous experiences under the Confederation when the States vied in discriminatory measures against each other. In order to end these evils, the grant in the Constitution conferred upon Congress an authority at all times adequate to secure the freedom of interstate commercial intercourse from state control and to provide effective regulation of that intercourse as the national interest may demand. The words "among the several States" distinguish between the commerce which concerns more States than one and that commerce which is confined within one State and does not affect other States. "The genius and character of the whole government," said Chief Justice Marshall, "seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government. The completely internal commerce of a State, then, may be considered as reserved for the State itself."

(*Id.*, p. 195.) This reservation to the States manifestly is only of that authority which is consistent with and not opposed to the grant to Congress. There is no room in our scheme of government for the assertion of state power in hostility to the authorized exercise of Federal power. The authority of Congress extends to every part of interstate commerce, and to every instrumentality or agency by which it is carried on; and the full control by Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations. This is not to say that the Nation may deal with the internal concerns of the State, as such, but that the execution by Congress of its constitutional power to regulate interstate commerce is not limited by the fact that intrastate transactions may have become so interwoven therewith that the effective government of the former incidentally controls the latter. This conclusion necessarily results from the supremacy of the national power within its appointed sphere. *McCulloch* v. *Maryland*, 4 Wheat. 316, 405, 426; *The Daniel Ball*, 10 Wall. 557, 565; *Smith* v. *Alabama*, 124 U. S. 465, 473; *Baltimore & Ohio R. R. Co.* v. *Interstate Commerce Commission*, 221 U. S. 612, 618, 619; *Southern Railway Co.* v. *United States*, 222 U. S. 20, 26, 27; *Mondou* v. *N. Y., N. H. & H. R. R. Co.*, 223 U. S. 1, 47, 54, 55.

The grant in the Constitution of its own force, that is, without action by Congress, established the essential immunity of interstate commercial intercourse from the direct control of the States with respect to those subjects embraced within the grant which are of such a nature as to demand that, if regulated at all, their regulation should be prescribed by a single authority. It has repeatedly been declared by this court that as to those subjects which require a general system or uniformity of regulation the power of Congress is exclusive. In other matters, admitting of diversity of treatment according to the special

requirements of local conditions, the States may act within their respective jurisdictions until Congress sees fit to act; and, when Congress does act, the exercise of its authority overrides all conflicting state legislation. *Cooley* v. *Board of Wardens*, 12 How. 299, 319; *Ex parte McNiel*, 13 Wall. 236, 240; *Welton* v. *Missouri*, 91 U. S. 275, 280; *County of Mobile* v. *Kimball*, 102 U. S. 691, 697; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 204; *Bowman* v. *Chicago &c. Railway Co.*, 125 U. S. 465, 481, 485; *Gulf, Colorado & Santa Fe Ry. Co.* v. *Hefley*, 158 U. S. 98, 103, 104; *Northern Pacific Ry. Co.* v. *Washington*, 222 U. S. 370, 378; *Southern Ry. Co.* v. *Reid*, 222 U. S. 424, 436.

The principle, which determines this classification, underlies the doctrine that the States cannot under any guise impose direct burdens upon interstate commerce. For this is but to hold that the States are not permitted directly to regulate or restrain that which from its nature should be under the control of the one authority and be free from restriction save as it is governed in the manner that the national legislature constitutionally ordains.

Thus, the States cannot tax interstate commerce, either by laying the tax upon the business which constitutes such commerce or the privilege of engaging in it, or upon the receipts, as such, derived from it (*State Freight Tax Case*, 15 Wall. 232; *Robbins* v. *Shelby Taxing District*, 120 U. S. 489; *Philadelphia & Southern Mail S. S. Co.* v. *Pennsylvania*, 122 U. S. 326; *Leloup* v. *Mobile*, 127 U. S. 640; *McCall* v. *California*, 136 U. S. 104; *Brennan* v. *Titusville*, 153 U. S. 289; *Galveston, Harrisburg & San Antonio Railway Co.* v. *Texas*, 210 U. S. 217; *Western Union Telegraph Co.* v. *Kansas*, 216 U. S. 1; *Pullman Co.* v. *Kansas*, 216 U. S. 1, 56; *Meyer* v. *Wells, Fargo & Co.*, 223 U. S. 298; *Crenshaw* v. *Arkansas*, 227 U. S. 389); or upon persons or property in transit in interstate commerce (*Passenger Cases*, 7 How. 283; *Crandall* v. *Nevada*, 6 Wall. 35; *State Freight Tax Case, supra*, p. 281; *Coe* v. *Errol*, 116

U. S. 517; *Kelley* v. *Rhoads*, 188 U. S. 1; *Bacon* v. *Illinois*, 227 U. S. 504).

They have no power to prohibit interstate trade in legitimate articles of commerce (*Bowman* v. *Chicago &c. Railway Co., supra; Leisy* v. *Hardin*, 135 U. S. 100; *Vance* v. *Vandercook Co.* (No. 1), 170 U. S. 438; *Schollenberger* v. *Pennsylvania*, 171 U. S. 1; *Oklahoma* v. *Kansas Natural Gas Co.*, 221 U. S. 229; *L. & N. R. R. Co.* v. *Cook Brewing Co.*, 223 U. S. 70); or to discriminate against the products of other States (*Ward* v. *Maryland*, 12 Wall. 418; *Welton* v. *Missouri, supra; Hannibal & St. J. R. R. Co.* v. *Husen*, 95 U. S. 465; *Guy* v. *Baltimore*, 100 U. S. 434; *Walling* v. *Michigan*, 116 U. S. 446; *Minnesota* v. *Barber*, 136 U. S. 313; *Brimmer* v. *Rebman*, 138 U. S. 78; *Darnell* v. *Memphis*, 208 U. S. 113); or to exclude from the limits of the State corporations or others engaged in interstate commerce or to fetter by conditions their right to carry it on (*Crutcher* v. *Kentucky*, 141 U. S. 47; *Western Union Telegraph Co.* v. *Kansas, supra; Pullman Co.* v. *Kansas, supra; International Text Book Co.* v. *Pigg*, 217 U. S. 91; *Buck Stove Co.* v. *Vickers*, 226 U. S. 205); or to prescribe the rates to be charged for transportation from one State to another, or to subject the operations of carriers in the course of such transportation to requirements that are unreasonable or pass beyond the bounds of suitable local protection (*Wabash &c. Railway Co.* v. *Illinois*, 118 U. S. 557, 577; *Covington &c. Bridge Co.* v. *Kentucky*, 154 U. S. 204; *Louisville & Nashville R. R. Co.* v. *Eubank*, 184 U. S. 27; *Hanley* v. *Kansas City Southern Ry. Co.*, 187 U. S. 617; *R. R. Commission of Ohio* v. *Worthington*, 225 U. S. 101; *Texas & N. O. R. R. Co.* v. *Sabine Tram Co.*, 227 U. S. 111; *Hall* v. *DeCuir*, 95 U. S. 485, 488; *Cleveland, C., C. & St. L. Railway Co.* v. *Illinois*, 177 U. S. 514; *Houston & T. C. R. R. Co.* v. *Mayes*, 210 U. S. 321; *McNeill* v. *Southern Railway Co.*, 202 U. S. 543; *Mississippi R. R. Commission* v. *Illinois Cent R. R. Co.*, 203 U. S. 335;

*Atlantic Coast Line* v. *Wharton*, 207 U. S. 328; *St. Louis Southwestern Ry. Co.* v. *Arkansas*, 217 U. S. 136; *Herndon v. C., R. I. & Pac. R. R. Co.*, 218 U. S. 135; *Yazoo &c. R. R. Co.* v. *Greenwood Grocery Co.*, 227 U. S. 1).

But within these limitations there necessarily remains to the States, until Congress acts, a wide range for the permissible exercise of power appropriate to their territorial jurisdiction although interstate commerce may be affected. It extends to those matters of a local nature as to which it is impossible to derive from the constitutional grant an intention that they should go uncontrolled pending Federal intervention. Thus, there are certain subjects having the most obvious and direct relation to interstate commerce, which nevertheless, with the acquiescence of Congress, have been controlled by state legislation from the foundation of the Government because of the necessity that they should not remain unregulated and that their regulation should be adapted to varying local exigencies; hence, the absence of regulation by Congress in such matters has not imported that there should be no restriction but rather that the States should continue to supply the needed rules until Congress should decide to supersede them. Further, it is competent for a State to govern its internal commerce, to provide local improvements, to create and regulate local facilities, to adopt protective measures of a reasonable character in the interest of the health, safety, morals and welfare of its people, although interstate commerce may incidentally or indirectly be involved. Our system of government is a practical adjustment by which the National authority as conferred by the Constitution is maintained in its full scope without unnecessary loss of local efficiency. Where the subject is peculiarly one of local concern, and from its nature belongs to the class with which the State appropriately deals in making reasonable provision for local needs, it cannot be regarded as left to the unrestrained will of individuals

because Congress has not acted, although it may have such a relation to interstate commerce as to be within the reach of the Federal power. In such case, Congress must be the judge of the necessity of Federal action. Its paramount authority always enables it to intervene at its discretion for the complete and effective government of that which has been committed to its care, and, for this purpose and to this extent, in response to a conviction of national need, to displace local laws by substituting laws of its own. The successful working of our constitutional system has thus been made possible.

The leading illustrations may be noted. Immediately upon the adoption of the Constitution, Congress recognized the propriety of local action with respect to pilotage, in view of the local necessities of navigation. Act of August 7, 1789, c. 9, § 4; 1 Stat. 53, 54; *Cooley* v. *Board of Wardens, supra.* It was sixty years before provision for Federal license of pilots was made (act of August 30, 1852, c. 106; 10 Stat. 61), and even then port pilots were not included. *Pacific Mail Steamship Co.* v. *Joliffe,* 2 Wall. 450, 459. And while Congress has full power over the subject and to a certain extent has prescribed rules, it is still in a large measure subject to the regulation of the States. *Anderson* v. *Pacific Coast S. S. Co.,* 225 U. S. 187.

A State is entitled to protect its coasts, to improve its harbors, bays and streams, and to construct dams and bridges across navigable rivers within its limits, unless there is conflict with some act of Congress. Plainly, in the case of dams and bridges, interference with the accustomed right of navigation may result. But this exercise of the important power to provide local improvements has not been regarded as constituting such a direct burden upon intercourse or interchange of traffic as to be repugnant to the Federal authority in its dormant state. *Willson* v. *Blackbird Creek Marsh Co.,* 2 Pet. 245; *Gilman* v. *Philadelphia,* 3 Wall. 713; *Pound* v. *Turck,* 95 U. S. 459; *County of*

*Mobile* v. *Kimball, supra; Escanaba Co.* v. *Chicago,* 107 U. S. 678; *Cardwell* v. *American Bridge Co.,* 113 U. S. 205; *Huse* v. *Glover,* 119 U. S. 543, 547; *Willamette Bridge Co.* v. *Hatch,* 125 U. S. 1; *Lake Shore & Michigan C. Ry. Co.* v. *Ohio,* 165 U. S. 365; *Cummings* v. *Chicago,* 188 U. S. 410; *Manigault* v. *Springs,* 199 U. S. 473. Thus, in *Gilman* v. *Philadelphia, supra,* the complainants were the owners of a valuable wharf and dock property in the Schuylkill River and sought to prevent the construction of a bridge which had been authorized by the legislature of Pennsylvania to connect East and West Philadelphia. It appeared that the bridge would prevent the passage of vessels having masts which had formerly navigated the river up to the complainants' wharf, and would largely reduce the income from the property. The court affirmed the dismissal of the bill upon the ground that in the absence of legislation by Congress the State was acting within its authority "The States have always exercised this power," said the court (*id.,* p. 729), "and from the nature and objects of the two systems of government they must always continue to exercise it, subject, however, in all cases, to the paramount authority of Congress, whenever the power of the States shall be exerted within the sphere of the commercial power which belongs to the Nation." Again, in *Escanaba Co.* v. *Chicago, supra,* the question related to the power of the City of Chicago, acting under the authority of the State, to regulate the closing of draws in the bridges over the Chicago River. The court said: "The Chicago River and its branches must . . . be deemed navigable waters of the United States, over which Congress under its commercial power may exercise control to the extent necessary to protect, preserve, and improve their free navigation. But the States have full power to regulate within their limits matters of internal police, including in that general designation, whatever will promote the peace, comfort, convenience, and prosperity

of their people.  This power embraces the construction of roads, canals, and bridges, and the establishment of ferries, and it can generally be exercised more wisely by the States than by a distant authority.  . . .   When its (the State's) power is exercised, so as to unnecessarily obstruct the navigation of the river or its branches, Congress may interfere and remove the obstruction.  . . .   But until Congress acts on the subject, the power of the State over bridges across its navigable streams is plenary." (*Id.*, p. 683.)

While the State may not impose a duty on tonnage (*Steamship Co.* v. *Portwardens,* 6 Wall. 31; *State Tonnage Tax Cases,* 12 Wall. 204, 212; *Cannon* v. *New Orleans,* 12 Wall. 577), it may regulate wharfage charges and exact tolls for the use of artificial facilities provided under its authority.  The subject is one under state control, where Congress has not acted, although the payment is required of those engaged in interstate or foreign commerce.  *Keokuk Packet Co.* v. *Keokuk,* 95 U. S. 80; *Cincinnati &c. Packet Co.* v. *Catlettsburg,* 105 U. S. 559; *Parkersburg & O. R. Transportation Co.* v. *Parkersburg,* 107 U. S. 691; *Huse* v. *Glover, supra; Ouachita Packet Co.* v. *Aiken,* 121 U. S. 444; *Sands* v. *Manistee River Improvement Co.,* 123 U. S. 288, 295.  In *Transportation Co.* v. *Parkersburg, supra,* the court had before it an ordinance of that city prescribing rates of wharfage on vessels discharging or receiving freight at public landings belonging to the city.  A transportation company having steamers plying between Pittsburg and Cincinnati complained that the wharfage charge was exorbitant.  The court held that the reasonableness of the charge, it being simply one for wharfage, was to be determined by the state law.  "The regulation of wharves belongs *prima facie,* and in the first instance, to the States, and would only be assumed by Congress when its exercise by the States is incompatible with the interests of commerce."  (*Id.*, p. 703.)  Again, in *Ouachita*

*Packet Co.* v. *Aiken, supra,* where the owners of steam-boats engaged in interstate commerce on the Mississippi River complained of wharfage rates at New Orleans as unreasonable and excessive, and in effect "a direct duty, or burden, upon commerce," the court, overruling the contention, held that the case was "clearly within the principles of the former decisions of this court, which affirm the right of a State, in the absence of regulation by Congress, to establish, manage and carry on works and improvements of a local character, though necessarily more or less affecting interstate and foreign commerce." (*Id.,* p. 447.)

Quarantine regulations are essential measures of protection which the States are free to adopt when they do not come into conflict with Federal action. In view of the need of conforming such measures to local conditions, Congress from the beginning has been content to leave the matter for the most part, notwithstanding its vast importance, to the States and has repeatedly acquiesced in the enforcement of state laws. (Act of February 25, 1799, c. XII, 1 Stat. 619, R. S., § 4797; Act of April 29, 1878, c. 66, 20 Stat. 37; Act of February 15, 1893, c. 114, 27 Stat. 449.) Such laws undoubtedly operate upon interstate and foreign commerce. They could not be effective otherwise. They cannot, of course, be made the cover for discriminations and arbitrary enactments having no reasonable relation to health (*Hannibal & St. J. Railroad Co.* v. *Husen,* 95 U. S. 465, 472, 473); but the power of the State to take steps to prevent the introduction or spread of disease, although interstate and foreign commerce are involved (subject to the paramount authority of Congress if it decides to assume control), is beyond question. *Morgan's &c. S. S. Co.* v. *Louisana,* 118 U. S. 455; *Missouri, Kansas & Texas Ry. Co.* v. *Haber,* 169 U. S. 613; *Louisiana* v. *Texas,* 176 U. S. 1; *Rasmussen* v. *Idaho,* 181 U. S. 198; *Compagnie Francaise &c.* v. *Board of Health,* 186

U. S. 380; *Reid* v. *Colorado*, 187 U. S. 137, 138; *Asbell* v. *Kansas*, 209 U. S. 251. In *Compagnie Francaise &c.* v. *Board of Health, supra*, the court had before it the quarantine law of Louisiana which, among other things, provided the State Board of Health might "in its discretion, prohibit the introduction into any infected portions of the State, persons acclimated, or unacclimated or said to be immune, when in its judgment the introduction of such persons would add to or increase the prevalence of the disease." The Supreme Court of the State, interpreting the statute, held that it empowered the Board to exclude healthy persons from a locality infested with a contagious or infectious disease, whether they came from without or within the State. It was objected that this provision was too broad and that the former decisions of the court were based upon the right of the States to exclude diseased persons and things which were not legitimate subjects of commerce. The court sustained the law, saying, with respect to this argument: "But it must be at once observed that this erroneously states the doctrine as concluded by the decisions of this court previously referred to, since the proposition ignores the fact that those cases expressly and unequivocally hold that the health and quarantine laws of the several States are not repugnant to the Constitution of the United States, although they affect foreign and domestic commerce, as in many cases they necessarily must do in order to be efficacious, because until Congress has acted under the authority conferred upon it by the Constitution, such state health and quarantine laws producing such effect on legitimate interstate commerce are not in conflict with the Constitution. True is it that, in some of the cases relied on in the argument, it was held that a state law absolutely prohibiting the introduction, under all circumstances, of objects actually affected with disease, was valid because such objects were not legitimate commerce. But this implies no limitation on the power to

regulate by health laws the subjects of legitimate commerce. In other words, the power exists until Congress has acted, to incidentally regulate by health and quarantine laws, even although interstate and foreign commerce is affected, and the power to absolutely prohibit additionally obtains where the thing prohibited is not commerce, and hence not embraced in either interstate or foreign commerce." (*Id.*, p. 391.)

State inspection laws and statutes designed to safeguard the inhabitants of a State from fraud and imposition are valid when reasonable in their requirements and not in conflict with Federal rules, although they may affect interstate commerce in their relation to articles prepared for export or by including incidentally those brought into the State and held for sale in the original imported packages. *Gibbons* v. *Ogden, supra*, p. 203; *Turner* v. *Maryland*, 107 U. S. 38; *Plumley* v. *Massachusetts*, 155 U. S. 461; *Patapsco Guano Co.* v. *North Carolina*, 171 U. S. 345, 357, 358; *Savage* v. *Jones*, 225 U. S. 501. And for the protection of its game and the preservation of a valuable food supply, the State may penalize the possession of game during the closed season whether obtained within the State or brought from abroad. *Silz* v. *Hesterberg*, 211 U. S. 31.

Interstate carriers, in the absence of Federal statute providing a different rule, are answerable according to the law of the State for nonfeasance or misfeasance within its limits. *Chicago, Milwaukee &c. Ry. Co.* v. *Solan*, 169 U. S. 133, 137; *Pennsylvania R. R. Co.* v. *Hughes*, 191 U. S. 477, 491; *Martin* v. *Pittsburg & Lake Erie R. R. Co.*, 203 U. S. 284, 294; *Southern Pacific Co.* v. *Schuyler*, 227 U. S. 601, 613. Until the enactment by Congress of the act of April 22, 1908, c. 149, 35 Stat. 65, the laws of the States determined the liability of interstate carriers by railroad for injuries received by their employés while engaged in interstate commerce, and this was because Congress, although empowered to regulate the subject,

had not acted thereon. In some States the so-called fellow-servant rule obtained; in others, it had been abrogated; and it remained for Congress, in this respect and in other matters specified in the statute, to establish a uniform rule. *Mondou* v. *N. Y., N. H. & H. R. R. Co.,* *supra; Michigan Central R. R. Co.* v. *Vreeland,* 227 U. S. 59, 66, 67. So, where Congress has not intervened, state statutes providing damages for wrongful death may be enforced not only against land carriers but also against the owners of vessels engaged in interstate commerce where the wrong occurs within the jurisdiction of the State. *Sherlock* v. *Alling,* 93 U. S. 99, 103. See *American Steamboat Co.* v. *Chase,* 16 Wall. 522; *The Hamilton,* 207 U. S. 398. And, until Congress legislated on the matter, liability for loss of property, on interstate as well as intrastate shipments, was subject to state regulation. Some States allowed an exemption by contract from all or a part of the common law liability; others allowed no exemption. These differences in the applicable laws created inequalities with respect to interstate transportation, but each State exercised the power inherent in its territorial jurisdiction, and the remedy for the resulting diversity lay with Congress, which was free to substitute its own regulations; and this was done in the recent amendment of § 20 of the Act to Regulate Commerce. Act of June 29, 1906, c. 3591, 34 Stat. 584; *Adams Express Co.* v. *Croninger,* 226 U. S. 491, 500. It is within the competency of a State to create and enforce liens upon vessels for supplies furnished under contracts not maritime in their nature, and it is no valid objection that the state law may obstruct the prosecution of a voyage of an interstate character. *The Winnebago,* 205 U. S. 354. It may also create liens for damages to property on land occasioned by negligence of vessels. *Johnson* v *Chicago &c. Elevator Co.,* 119 U. S. 388; *Martin* v. *West,* 222 U. S. 191. Cars employed in interstate commerce may be

seized by attachment under state law, in order to compel
the payment of debts. *Davis* v. *C., C., C. & St. L. Ry.
Co.*, 217 U. S. 157. And the legislation of the States,
safeguarding life and property and promoting comfort
and convenience within its jurisdiction, may extend
incidentally to the operations of the carrier in the conduct
of interstate business, provided it does not subject that
business to unreasonable demands and is not opposed to·
Federal legislation. *Smith* v. *Alabama*, 124 U. S. 465;
*Hennington* v. *Georgia*, 163 U. S. 299; *N. Y., N. H. &
H. R. R. Co.* v. *New York*, 165 U. S. 628; *Lake Shore &
M. S. Ry. Co.* v. *Ohio*, 173 U. S. 285; *Missouri Pacific
Ry. Co.* v. *Larabee Mills*, 211 U. S. 612; *Missouri Pacific
Ry. Co.* v. *Kansas*, 216 U. S. 262. It has also been held
that the State has the power to forbid the consolidation of
state railroad corporations with competing lines although
both may be interstate carriers and the prohibition may
have a far-reaching effect upon interstate commerce.
*Pearsall* v. *Great Northern Ry. Co.*, 161 U. S. 646, 677;
*Louisville & Nashville R. R. Co.* v. *Kentucky*, 161 U. S.
677, 701, 702. See *Northern Securities Co.* v. *United
States*, 193 U. S. 197, 317, 348, 382.

Again, it is manifest that when the legislation of the
State is limited to internal commerce to such degree that
it does not include even incidentally the subjects of in-
terstate commerce, it is not rendered invalid because it
may affect the latter commerce indirectly. In the inti-
macy of commercial relations, much that is done in the
superintendence of local matters may have an indirect
bearing upon interstate commerce. The development of
local resources and the extension of local facilities may
have a very important effect upon communities less
favored and to an appreciable degree alter the course
of trade. The freedom of local trade may stimulate inter-
state commerce, while restrictive measures within the
police power of the State enacted exclusively with re-

spect to internal business, as distinguished from inter-
state traffic, may in their reflex or indirect influence
diminish the latter and reduce the volume of articles trans-
ported into or out of the State. It was an objection of
this sort that was urged and overruled in *Kidd* v. *Pearson,*
128 U. S. 1, to the law of Iowa prohibiting the manu-
facture and sale of liquor within the State, save for
limited purposes. See also *Geer* v. *Connecticut,* 161 U. S.
519, 534; *Austin* v. *Tennessee,* 179 U. S. 343; *Capital
City Dairy Co.* v. *Ohio,* 183 U. S. 238, 245; *Missouri
Pacific Ry. Co.* v. *Kansas, supra.* When, however, the
State in dealing with its internal commerce undertakes
to regulate instrumentalities which are also used in in-
terstate commerce, its action is necessarily subject to the
exercise by Congress of its authority to control such in-
strumentalities so far as may be necessary for the purpose
of enabling it to discharge its constitutional function.
*Southern Railway Co.* v. *United States, supra; Baltimore &
Ohio Railroad Co.* v. *Interstate Commerce Commission, supra.*

Within the state power, then, in the words of Chief
Justice Marshall is, "that immense mass of legislation,
which embraces everything within the territory of a State,
not surrendered to a general government: all which can be
most advantageously exercised by the States themselves.
Inspection laws, quarantine laws, health laws of every
description, as well as laws for regulating the internal
commerce of a State, and those which respect turnpike
roads, ferries, &c., are component parts of this mass. No
direct general power over these objects is granted to Con-
gress: and, consequently, they remain subject to state
legislation. If the legislative power of the Union can reach
them, it must be for national purposes; it must be where
the power is expressly given for a special purpose, or is
clearly incidental to some power which is expressly given."
*Gibbons* v. *Ogden, supra,* pp. 203, 304.

And, wherever as to such matters, under these estab-

lished principles, Congress may be entitled to act, by virtue of its power to secure the complete government of interstate commerce, the state power nevertheless continues until Congress does act and by its valid interposition limits the exercise of the local authority.

(2) These principles apply to the authority of the State to prescribe reasonable maximum rates for intrastate transportation.

State regulation of railroad rates began with railroad transportation. The railroads were chartered by the States and from the outset, in many charters, maximum rates for freight or passengers, or both were prescribed.[1] Frequently—and this became the more general practice— the board of directors was permitted to fix charges in its discretion, an authority which in numerous instances was made subject to a limitation upon the amount of net earnings.[2] In several States maximum rates were also established, or the power to alter rates was expressly reserved, by general laws.[3] In 1853, the State of New

---

[1] E. g. Maryland, Laws of 1826, c. CXXIII, § 18; 1830, c. 117, §§ 2, 3; 1834, c. 281, § 3: Massachusetts, Laws of 1829, c. XXVI, § 6; 1830, c. XCIII, § 10: New York, Laws of 1828, c. 21, § 11; c. 238, § 11; 1831, c. 83, § 10; 1836, c. 242, § 9: Virginia, Laws of 1830–1831, c. CXIX, § 19; c. CXXI, § 18; 1835–1836, c. 121, § 24: Ohio, Laws of 1833–1834, p. 203, § 19; p. 396, § 9: North Carolina, Laws of 1836–1837, c. XL, § 30.

[2] Connecticut, 1832, II Resolves and Private Laws (1789–1836), p. 992: Indiana, Laws of 1832, c. CXLVI, §§ 23, 24: Florida, Laws of 1848, c. 244, § 11: New York, Laws of 1828, c. 304, § 13; 1832, c. 162, §§ 12, 17: Massachusetts, Laws of 1833, c. CXVIII, § 4: Virginia, Laws of 1839, c. 110, § 5: Wisconsin, Laws of 1847, p. 72, § 15; 1851, c. 262, § 7.

[3] Illinois, Laws of 1849, p. 15, §§ 21, 32: Massachusetts, Laws of 1845, c. 191, § 2; 1860, c. 201, § 2: New York, Laws of 1850, c. 140, § 33: California, Laws of 1850, c. 128, § 77; 1861, c. DXXXII, § 51: Iowa, Code of 1873, § 1305; Laws of 1874, c. 68, §§ 1–5: Report of Industrial Commission, 1901, Vol. IX, pp. 903–905, 911–915.

York fixed the maximum fare for way passengers on the railroads forming the line of New York Central at two cents a mile (Laws of 1853, c. 76, § 7) and this rate extending to Buffalo and Suspension Bridge, on the boundary of the State, has continued to the present day (Cons. Laws, N. Y., 1910, c. 49, § 57). As a rule the restrictions imposed by the early legislation were far from onerous, but they are significant in the assertion of the right of control. More potent than these provisions, in the actual effect upon railroads tariffs, was the state canal. It is a matter of common knowledge that the traffic on the trunk lines from the Atlantic seaboard to the west was developed in competition with the Erie Canal, built, maintained and regulated by the State of New York to promote its commerce.

The authority of the State to limit by legislation the charges of common carriers within its borders was not confined to the power to impose limitations in connection with grants of corporate privileges. In view of the nature of their business, they were held subject to legislative control as to the amount of their charges unless they were protected by their contract with the State. This was decided in *Chicago, Burlington & Quincy R. R. Co.* v. *Iowa*, 94 U. S. 155; *Peik* v. *Chicago & Northwestern Railway Co.*, 94 U. S. 164; *Winona & St. Peter R. R. Co.* v. *Blake*, 94 U. S. 180, and other cases, following *Munn* v. *Illinois*, 94 U. S. 113. The question was presented by acts of the legislatures of Illinois, Iowa, Wisconsin and Minnesota, passed in the years 1871 and 1874 in response to a general movement for a reduction of rates. The section of the country in which the demand arose was to a large degree homogeneous and one in which the flow of commerce was only slightly concerned with state lines. But resort was had to the States for relief. In the *Munn Case*, the court had before it the statute of Illinois governing the grain warehouses in Chicago. Through these elevators,

located with the river harbor on the one side and the railway tracks on the other, it was necessary according to the course of trade for the product of seven or eight States of the West to pass on its way to the States on the Atlantic coast. In addition to the denial of any legislative authority to limit charges it was urged that the act was repugnant to the exclusive power of Congress to regulate interstate commerce. The court answered that the business was carried on exclusively within the limits of the State of Illinois, that its regulation was a thing of domestic concern and that "certainly, until Congress. acts in reference to their interstate relations, the State may exercise all the powers of government over them, even though in so doing it may indirectly operate upon commerce outside its immediate jurisdiction." In the decision of the railroad cases, above cited, the same opinion was expressed. The language of the court, however, went further than to sustain the state law with respect to rates for purely intrastate carriage. Thus, the act of Wisconsin covered traffic which started within the State and was destined to points outside, and this was treated as being within the state power (*Peik* v. *Chicago & Northwestern Railway Co.*, 94 U. S. 164, 177, 178), a view which was later repudiated. *Wabash, St. L. & P. Railway Co.* v. *Illinois*, 118 U. S. 557.

It became a frequent practice for the States to create commissions, as agencies of state supervision and regulation, and in many instances the rate-making power was conferred upon these bodies. A summary of such legislation is given in *Interstate Commerce Commission* v. *Chicago, N. O. & T. P. Ry. Co.*, 167 U. S. 479, 495, 496. One of these state laws, that of Mississippi, passed in 1884, came under review in *Stone* v. *Farmers Loan & Trust Co.*, 116 U. S. 307. The suit was brought to enjoin the Railroad Commission from enforcing the statute against the Mobile and Ohio Railroad Company. It had been incor-

porated in the States of Alabama, Mississippi, Tennessee and Kentucky, for the purpose of constructing a railroad from Mobile to some point near the mouth of the Ohio River where it would connect with another railroad, thus forming a continuous line of interstate communication between the Gulf of Mexico and the Great Lakes. The Commission as yet had not acted. Sustaining the state power to fix rates upon traffic wholly internal, the court directed the dismissal of the bill. The State, said the court, (p. 334) "may, beyond all question, by the settled rule of decision in this court, regulate freights and fares for business done exclusively within the State, and it would seem to be a matter of domestic concern to prevent the company from discriminating against persons and places in Mississippi." In the same case, it was declared that the power of regulation was not a power to confiscate; and that under pretense of regulating fares and freights, the States could not "require a railroad corporation to carry persons or property without reward," or do that which in law amounted "to a taking of private property for public use without just compensation, or without due process of law." (*Id.,* p. 331.)

In *Wabash, St. L. & P. Railway Co.* v. *Illinois, supra,* it was finally determined that the authority of the State did not extend to the regulation of charges for interstate transportation. There the state statute was aimed at discrimination. It was said to have been violated by the railroad company in the case of shipments from points within Illinois to the city of New York. The state court had construed the statute to be binding as to that part of the interstate haul which was within the State although inoperative beyond the boundary. So applied, this court held the act to be invalid.

But no doubt was entertained of the State's authority to regulate rates for transportation that was wholly intrastate. And, in illustrating the extent of state power

(*id.*, p. 564), the court selected transportation across the
State from Cairo to Chicago and from Chicago to Alton,
all boundary points constituting important centers of
commerce—the one on Lake Michigan, and the others
at the confluence of the Mississippi and Ohio rivers, and
of the Mississippi and Missouri rivers, respectively. After
reviewing decisions holding state laws to be ineffective
which imposed a direct burden upon interstate commerce,
including the cases of the *State Freight Tax*, 15 Wall. 232;
*Hall v. DeCuir*, 95 U. S. 485; *Gloucester Ferry Co. v. Penn-
sylvania*, 114 U. S. 196; *Pickard v. Pullman Southern Car
Co.*, 117 U. S. 34, the court emphasized the distinction
with respect to the operation of the statute upon domestic
transactions saying: "Of the justice or propriety of the
principle which lies at the foundation of the Illinois statute
it is not the province of this court to speak. As restricted
to a transportation which begins and ends within the
limits of the State it may be very just and equitable, and
it certainly is the province of the state legislature to deter-
mine that question." (*Id.*, p. 577.)

The doctrine was thus fully established that the State
could not prescribe interstate rates but could fix reason-
able intrastate rates throughout its territory. The ex-
tension of railroad facilities has been accompanied at
every step by the assertion of this authority on the part
of the States and its invariable recognition by this court.
It has never been doubted that the State could, if it saw
fit, build its own highways, canals and railroads. (*Railroad
Company v. Maryland*, 21 Wall. 456, 470, 471.) It could
build railroads traversing the entire State and thus join its
border cities and commercial centers by new highways of
internal intercourse to be always available upon reasonable
terms. Such provision for local traffic might indeed alter
relative advantages in competition, and, by virtue of
economic forces, those engaged in interstate trade and
transportation might find it necessary to make readjust-

ments extending from market to market through a wide sphere of influence; but such action of the State would not for that reason be regarded as creating a direct restraint upon interstate commerce and as thus transcending the state power. Similarly, the authority of the State to prescribe what shall be reasonable charges of common carriers for intrastate transportation, unless it be limited by the exertion of the constitutional power of Congress, is state-wide. As a power appropriate to the territorial jurisdiction of the State, it is not confined to a part of the State, but extends throughout the State—to its cities adjacent to its boundaries as well as to those in the interior of the State. To say that this power exists, but that it may be exercised only in prescribing rates that are on an equal or higher basis than those that are fixed by the carrier for interstate transportation, is to maintain the power in name while denying it in fact. It is to assert that the exercise of the legislative judgment in determining what shall be the carrier's charge for the intrastate service is itself subject to the carrier's will. But this state-wide authority controls the carrier and is not controlled by it; and the idea that the power of the State to fix reasonable rates for its internal traffic is limited by the mere action of the carrier in laying an interstate rate to places across the State's border, is foreign to our jurisprudence.

If this authority of the State be restricted, it must be by virtue of the paramount power of Congress over interstate commerce and its instruments; and, in view of the nature of the subject, a limitation may not be implied because of a dormant Federal power, that is, one which has not been exerted, but can only be found in the actual exercise of Federal control in such measure as to exclude this action by the State which otherwise would clearly be within its province.

(3.) When Congress, in the year 1887, enacted the Act to Regulate Commerce (24 Stat. 379, c. 104), it was ac-

quainted with the course of the development of railroad transportation and with the exercise by the States of the rate-making power. An elaborate report had been made to the Senate by a committee authorized to investigate the subject of railroad regulation in which the nature and extent of state legislation, including the commission plan, were fully reviewed (Senate Report 46, submitted January 6, 1886, 49th Congress, 1st session). And it was the fact that beyond the bounds of state control there lay a vast field of unregulated activity in the conduct of interstate transportation which was found to be the chief cause of the demand for Federal action.

Congress carefully defined the scope of its regulation, and expressly provided that it was not to extend to purely intrastate traffic. In the first section of the Act to Regulate Commerce there was inserted the following proviso:

"*Provided, however,* That the provisions of this act shall not apply to the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property, wholly within one State, and not shipped to or from a foreign country from or to any State or Territory as aforesaid."

When in the year 1906 (act of June 29, 1906, c. 3591, 34 Stat. 584), Congress amended the act so as to confer upon the Federal commission power to prescribe maximum interstate rates, the proviso in section one was reënacted. Again, in 1910, when the act was extended to embrace telegraph, telephone and cable companies engaged in interstate business, the proviso was once more reënacted, with an additional clause so as to exclude intrastate messages from the operation of the statute. Act of June 18, 1910, c. 309, 36 Stat. 539, 545. The proviso in its present form reads:

"*Provided, however,* That the provisions of this Act shall not apply to the transportation of passengers or property, or to the receiving, delivering, storage, or han-

dling of property wholly within one State and not shipped to or from a foreign country from or to any State or Territory as aforesaid, nor shall they apply to the transmission of messages by telephone, telegraph, or cable wholly within one State and not transmitted to or from a foreign country from or to any State or Territory as aforesaid."

There was thus excluded from the provisions of the act that transportation which was "wholly within one State," with the specified qualification where its subject was going to or coming from a foreign country.

It is urged, however, that the words of the proviso are susceptible of a construction which would permit the provisions of section three of the act, prohibiting carriers from giving an undue or unreasonable preference or advantage to any locality, to apply to unreasonable discriminations between localities in different States, as well when arising from an intrastate rate as compared with an interstate rate as when due to interstate rates exclusively. If it be assumed that the statute should be so construed, and it is not necessary now to decide the point, it would inevitably follow that the controlling principle governing the enforcement of the act should be applied to such cases as might thereby be brought within its purview; and the question whether the carrier, in such a case, was giving an undue or unreasonable preference or advantage to one locality as against another, or subjecting any locality to an undue or unreasonable prejudice or disadvantage, would be primarily for the investigation and determination of the Interstate Commerce Commission and not for the courts. The dominating purpose of the statute was to secure conformity to the prescribed standards through the examination and appreciation of the complex facts of transportation by the body created for that purpose; and, as this court has repeatedly held, it would be destructive of the system of regulation defined by the statute if the

court without the preliminary action of the Commission were to undertake to pass upon the administrative questions which the statute has primarily confided to it. *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426; *Baltimore & Ohio R. R. Co.* v. *Pitcairn Coal Co.*, 215 U. S. 481; *Robinson* v. *Baltimore & Ohio R. R. Co.*, 222 U. S. 506; *United States* v. *Pacific & Arctic Co.*, 228 U. S. 87. In the present case, there has been no finding by the Interstate Commerce Commission of unjust discrimination violative of the act; and no action of that body is before us for review.

The question we have now before us, essentially, is whether after the passage of the Interstate Commerce Act, and its amendment, the State continued to possess the state-wide authority which it formerly enjoyed to prescribe reasonable rates for its exclusively internal traffic. That, as it plainly appears, was the nature of the action taken by Minnesota, and the attack, however phrased, upon the rates here involved as an interference with interstate commerce, is in substance a denial of that authority.

Having regard to the terms of the Federal statute, the familiar range of state action at the time it was enacted, the continued exercise of state authority in the same manner and to the same extent after its enactment, and the decisions of this court recognizing and upholding this authority, we find no foundation for the proposition that the Act to Regulate Commerce contemplated interference therewith.

Congress did not undertake to say that the intrastate rates of interstate carriers should be reasonable or to invest its administrative agency with authority to determine their reasonableness. Neither by the original act nor by its amendment, did Congress seek to establish a unified control over interstate and intrastate rates; it did not set up a standard for intrastate rates, or prescribe, or

authorize the Commission to prescribe, either maximum or minimum rates for intrastate traffic. It cannot·be supposed that Congress sought to accomplish by indirection that which it expressly disclaimed, or attempted to override the accustomed authority of the States without the provision of a substitute. On the contrary, the fixing of reasonable rates for intrastate transportation was left where it had been found; that is, with the States and the agencies created by the States to deal with that subject. *Missouri Pacific Ry. Co.* v. *Larabee Mills*, 211 U. S. 612, 620, 621.·

How clear was the purpose not to occupy the field thus left to the exercise of state power is shown by the clause uniformly inserted in the numerous acts passed by Congress to authorize the construction of railways across the Indian Territory. This clause, while fixing a maximum passenger rate, made the laws of an adjoining State (in some cases Arkansas, in others Texas, and in others Kansas) applicable to the freight rates to be charged within the Territory; and while the right to regulate rates on the authorized line of railroad was reserved to Congress until a state government should be established, it was expressly provided that, when established, the State should be entitled to fix rates for intrastate transportation—the right remaining with Congress to prescribe rates for such transportation as should be interstate. Within a month after the Act to Regulate Commerce was enacted, two acts were passed by Congress for this purpose with respect to railways extending across the Territory from the Texas to the Kansas boundary. The provision—in both cases in identical language—save that the one referred to the laws of Texas and the other to the laws of Kansas—was as follows (act of Feb. 24, 1887, c. 254, § 4, 24 Stat. 420; act of March 2, 1887, c. 319, § 4, *id.*, 447):

"Sec. 4. That said railroad company shall not charge the inhabitants of said Territory a greater rate of freight

than the rate authorized by the laws of the State of Texas
for services or transportation of the same kind: *Provided,*
*That· passenger rates on said railway shall not exceed*
*three cents per mile.* Congress hereby reserves the right
to regulate the charges for freight and passengers on said
railway, and messages on said telegraph and telephone
lines, *until a State government or governments shall exist in*
*said Territory within the limits of which said railway, or a*
*part thereof, shall be located; and then such State government*
*or governments shall be authorized to fix and regulate the*
*cost of transportation of persons and freights within their*
*respective limits by said railway;* but Congress expressly
reserves the right to fix and regulate at all times the cost
of such transportation by said railway or said company
whenever such transportation shall extend from one State
into another, or shall extend into more than one State:
*Provided, however,* That the rate of such transportation of
passengers, local or inter-State, shall not exceed the rate
above expressed: *And provided further,* That said railway
company shall carry the mail at such prices as Congress
may by law provide; and until such rate is fixed by law
the Postmaster-General may fix the rate of compensa-
tion."

· The same provision is found in similar statutes passed
in almost every year from 1884 to 1902 and relating to
lines intended to serve as highways of interstate com-
munication.[1] When Oklahoma became a State, the laws

---

[1] Referring to Laws of Texas: Acts of July 4, 1884, c. 177, § 4, 23
Stat. 69, 70; July 1, 1886, c. 601, § 4, 24 Stat. 117, 119; Feb. 18, 1888,
c. 13, § 4, 25 Stat. 35, 37; May 14, 1888, c. 248, § 4, 25 Stat. 140,
142; May 30, 1888, c. 337, § 4, 25 Stat. 162, 163; June 26, 1888, c. 494,
§ 4, 25 Stat. 205, 207; Oct. 1, 1890, c. 1248, § 4, 26 Stat. 632, 634; July 30,
1892, c. 329, § 4, 27 Stat. 336, 338; Mar. 1, 1893, c. 188, § 4, 27 Stat.
524, 525; Aug. 4, 1894, c. 215, § 4, 28 Stat. 229, 230; Mar. 23, 1898,
c. 87, § 4, 30 Stat. 341, 342.

Referring to Laws of Kansas: Acts of July 4, 1884, c. 179, § 4, 23
Stat. 73, 74; June 21, 1890, c. 479, § 4, 26 Stat. 170, 171; June 30, 1890,

of other States which were referred to in these various acts ceased to be operative within its limits, and by virtue of its Statehood and with the direct sanction of Congress, it became authorized to prescribe reasonable maximum rates for intrastate transportation throughout its extent. *Oklahoma* v. *A., T. & S. F. Ry. Co.*, 220 U. S. 277, 285; *Oklahoma* v. *C., R. I. & Pac. Ry. Co.*, 220 U. S. 302, 306.

The decisions of this court since the passage of the Act. to Regulate Commerce have uniformly recognized that it was competent for the State to fix such rates, applicable throughout its territory. If it be said that in the contests that have been waged over state laws during the past twenty-five years, the question of interference with interstate commerce by the establishment of state-wide rates for intrastate traffic has seldom been raised, this fact itself attests the common conception of the scope of state authority. And the decisions recognizing and defining the state power wholly refute the contention that the making of such rates either constitutes a direct burden upon interstate commerce or is repugnant to the Federal statute.

In *Dow* v. *Beidelman*, 125 U. S. 680, the statute of Arkansas, enacted in April, 1887 (April 4, 1887, Acts 1887,

---

c. 638, § 4, 26 Stat. 184, 185; Sept. 26, 1890, c. 947, § 4, 26 Stat. 485, 487; Feb. 27, 1893, c. 171, § 4, 27 Stat. 492, 493; Mar. 18, 1896, c. 60, § 4, 29 Stat. 69, 70; Mar. 30, 1896, c. 82, § 4, 29 Stat. 80, 82.

Referring to Laws of Arkansas: Acts of June 1, 1886, c. 395, § 4, 24 Stat. 73, 74; July 6, 1886, c. 744, § 4, 24 Stat. 124, 125; Feb. 18, 1888, c. 13, § 4, 25 Stat. 35, 37; May 30, 1888, c. 337, § 4, 25 Stat. 162, 163; Feb. 26, 1889, c. 280, § 4, 25 Stat. 745, 746; Feb. 24, 1891, c. 288, § 4, 26 Stat. 783, 785; Mar. 3, 1891, c. 535, § 4, 26 Stat. 844, 846; Feb. 24, 1896, c. 30, § 6, 29 Stat. 13, 15; Mar. 2, 1896, c. 38, § 4, 29 Stat. 40, 41; Apr. 6, 1896, c. 93, § 4, 29 Stat. 86, 88; Jan. 29, 1897, c. 108, § 4, 29 Stat. 502, 504; Mar. 30, 1898, c. 104, § 6, 30 Stat. 347, 349; Jan. 28, 1899, c. 65, § 5, 30 Stat. 806, 808; Feb. 4, 1899, c. 88, § 6, 30 Stat. 816, 818; Mar. 3, 1899, c. 453, § 6, 30 Stat. 1368, 1370.

Referring to Laws of Territory of Oklahoma: Act of Feb. 28, 1902, c. 134, § 4, 32 Stat. 43, 45.

p. 227) which established three cents a mile as the maximum fare for carrying passengers within the State on railroads over seventy-five miles in length, was sustained against the objection of the owners of the Memphis and Little Rock Railroad who attacked the act as confiscatory and arbitrary in its classification. The same statute was again upheld in *St. Louis & San Francisco Railway Co.* v. *Gill*, 156 U. S. 649. In *Chicago &c. Railway Co.* v. *Minnesota*, 134 U. S. 418, the statute of that State (March 7, 1887, Gen. Laws 1887, c. 10) creating a commission with power to prescribe intrastate rates was adjudged to be invalid, but this was upon the ground that the act as construed by the state court made the rates published by the commission final and conclusive and precluded any judicial inquiry whether they were reasonable. In *Chicago &c. Railway Co.* v. *Wellman*, 143 U. S. 339, the act of the legislature of Michigan (June 28, 1889, Pub. Laws 1889, p. 282) fixing the maximum fare for passengers within the State at two cents a mile in the case of companies whose gross earnings exceeded three thousand dollars a mile was unsuccessfully assailed as confiscatory and no contention was advanced that such an act operating throughout the State was an unwarrantable interference with interstate commerce.

In *Reagan* v. *Farmers Loan & Trust Co.*, 154 U. S. 362, the trustee of a railroad mortgage attacked the statute of Texas (April 3, 1891, Gen. Laws 1891, c. 51, p. 55) which established a railroad commission with authority to regulate tariffs, and the order of the commission providing a schedule of classified rates for the transportation of goods within the State. The challenge was of the tariff as a whole and the inquiry was whether the body of rates was unreasonable and such as to work a practical destruction of rights of property. Viewed in this aspect, the court, upon the allegations admitted by demurrer, held the action of the commission to be beyond its constitutional power

and affirmed the decree of the Circuit Court enjoining the rates. The decree, however, was reversed so far as it restrained the commission from discharging the duties imposed by the statute and from proceeding to prescribe reasonable rates and regulations. A further question was presented in *Reagan* v. *Mercantile Trust Company*, 154 U. S. 413, in respect to the same statute and order as applied to the Texas and Pacific Railway Company which had been organized under the laws of the United States (March 3, 1871, 16 Stat. 573, c. 122) and operated its road not only within that State but also for several hundred miles outside. It was insisted that this company was "not subject to the control of the State, even as to rates for transportation wholly within the State," the argument being that it was not within the state power to limit the Federal franchise to collect tolls. But the court held that the act of Congress did not go to the extent asserted but left the company, as to its intrastate business, subject to state authority.

The effect of intrastate rates upon interstate rates was urged in *Smyth* v. *Ames*, 169 U. S. 466, and in the cases decided therewith. These suits were brought by stockholders of the Union Pacific Railway Company, the Chicago and Northwestern Railroad Company and the Chicago, Burlington and Quincy Railroad Company, to enjoin the enforcement of the act of the legislature of Nebraska passed in 1893 (April 12, 1893, Acts 1893, c. 24). This was a comprehensive statute classifying the freight transported from any point in Nebraska to any other point in that State and prescribing tables of maximum rates. The companies affected were interstate carriers engaged in a vast commerce only a small portion of which was wholly local to the State. On the eastern boundary lay Omaha, a city of large importance in interstate trade, situated on the Missouri river with Council Bluffs, in the State of Iowa, directly opposite. The point was distinctly

made in the Circuit Court that the statute interfered with interstate commerce because, first, it established a classification of freights different from that which prevailed west of Chicago, and second, by reducing local rates it necessarily reduced rates on interstate business. Mr. Justice Brewer, who tried the cases, overruled these objections holding that neither the convenience of the carriers nor the consequences of competition with respect to interstate rates could be pleaded "in restraint of the otherwise undeniable power of the State." *Ames* v. *Union Pacific Railway Co.*, 64 Fed. Rep. 165, 171, 172. Having disposed of this contention, the court considered the question of the reasonableness of the rates and reached the conclusion that they were invalid because they amounted to a deprivation of the carriers' rights of property. On appeal to this court the counsel for the appellees directed attention to the conditions of transportation in Nebraska. It was argued that the local traffic was carried over the same tracks, in the same trains and often in the same cars with the interstate traffic; that to separate the cost of carrying the one sort of traffic from that of the other was a "manifest impossibility;" and that it was a necessary consequence of existing conditions that, if Nebraska controlled the local rates, it at the same time controlled the interstate rates. But this contention was not sustained and the affirmance of the decree was placed upon the distinct ground that the rates were confiscatory. It was ruled that the reasonableness of intrastate rates was to be determined by considering the intrastate business separately. In answer to the suggestion that the conditions of business might have changed for the better since the decrees, the court called attention to the proviso in the decrees intended to meet such a case, adding that if the Circuit Court found that conditions were such as to permit the application of the state rates without depriving the carriers of just compensation it would "be its duty

to discharge the injunction" and to make whatever order was necessary "to remove any obstruction placed by the decrees in these cases in the way of the enforcement of the statute." (*Id.*, p. 550; see *Smyth* v. *Ames,* 171 U. S. 361, 365.)

In that one of the *Smyth Cases* which was brought by the stockholders of the Union Pacific Railway Company not only was the case presented of a trunk line crossing the State with a relatively small proportion of business local to Nebraska, but the company had been formed by a consolidation of several companies by authority of Congress, one of them being the Union Pacific Railroad Company, incorporated by the act of July 1, 1862, c. 120, 12 Stat. 489. By this act (§ 18, *id.* 497), it was expressly provided that Congress might reduce the rates of fare if unreasonable and might fix the same by law whenever the net earnings of the entire road and telegraph should exceed a certain amount. But this language, while showing that Congress intended to reserve the power to prevent unreasonable exactions, was not deemed to be equivalent to a declaration that the States through which the road might be constructed should not regulate rates for intrastate transportation. The court said: "It cannot be doubted that the making of rates for transportation by railroad corporations along public highways, between points wholly within the limits of a State, is a subject primarily within the control of that State. . . . Congress not having exerted this power, we do not think that the national character of the corporation constructing the Union Pacific Railroad stands in the way of a State prescribing rates for transporting property on that road wholly between points within its territory. Until Congress, in the exercise either of the power specifically reserved by the eighteenth section of the act of 1862 or its power under the general reservation made of authority to add to, alter, amend or repeal that act, prescribes rates to be charged by

the railroad company, it remains with the States through which the road passes to fix rates for transportation beginning and ending within their respective limits." (169 U. S., pp. 521, 522.) It is plain that had the intrastate rates, established by the comprehensive statute of Nebraska, not been found to be confiscatory they would have been sustained in their application to all intrastate traffic notwithstanding the reserved power of Congress over the Union Pacific line and despite the argument based upon the interdependence of interstate and intrastate rates.

The cases of *Louisville & Nashville Railroad Co.* v. *Kentucky*, 183 U. S. 503, and *Louisville & Nashville Railroad Co.* v. *Eubank*, 184 U. S. 27, concerned the validity of the long and short haul provision of the constitution of Kentucky adopted in 1891. In the first case, violation was charged with respect to the transportation of coal from Altamont to Lebanon, an intermediate station, as compared with charges for transportation from Altamont to Elizabethtown and Louisville, all places being within Kentucky. The difference in rate was justified by the company on the ground that at Louisville the coal hauled from Altamont came into competition with that brought down the Ohio River and at Elizabethtown with western Kentucky coal brought there by the Illinois Central Railroad. The contention that the state provision operated as an interference with interstate commerce was presented and overruled, the court saying: "It is plain that the provision in question does not in terms embrace the case of interstate traffic. It is restricted in its regulation to those who own or operate a railroad within the State, and the long and short distances mentioned are evidently distances upon the railroad line within the State. The particular case before us is one involving only the transportation of coal from one point in the State of Kentucky to another by a corporation of that State. It may be that the enforcement of the state regulation forbidding discrimination in

rates in the case of articles of a like kind carried for different distances over the same line may somewhat affect commerce generally; but we have frequently held that such a result is too remote and indirect to be regarded as an interference with interstate commerce; that the interference with the commercial power of the general government to be unlawful must be direct, and not the merely incidental effect of enforcing the police powers of a State." (183 U. S., pp. 518, 519.) In the *Eubank Case*, which had been argued before the first case was decided, it appeared that the state court had construed the same provision of the Kentucky constitution as embracing a long haul from a place outside to one within the State (Nashville and Louisville) and a shorter haul on the same line and in the same direction between points within the State. The court held that, so construed, the provision was invalid as being a regulation of interstate commerce because it linked the interstate rate to the rate for the shorter haul and thus the interstate charge was directly controlled by the state law. (184 U. S., pp. 41, 43.) The authority of the former decision upholding the state law, as applied to places all of which were within the State, was in no way impaired and the court fully recognized the power of the State to prescribe maximum charges for intrastate traffic although carried over an interstate road to points on the state line. (*Id.*, pp. 33, 42.)

The case of *Minneapolis & St. Louis Railroad Co.* v. *Minnesota*, 186 U. S. 257, involved shipments of hard coal in carload lots from Duluth, Minnesota, to points in the southern and western portions of that State. The Railroad and Warehouse Commission of Minnesota, in 1899, prescribed a joint rate to be observed by the St. Paul and Duluth Railroad Company, the Minneapolis and St. Louis Railroad Company and other carriers. The state court directed the issue of a writ of mandamus to compel compliance with the order. It was objected that the act under

which the order was made was unconstitutional so far as it assumed to establish joint through rates over the lines of independent connecting railroads and to divide joint earnings, and that the tariff as fixed was not compensatory. This court affirmed the judgment. In *Alabama & Vicksburg Railroad Co.* v. *Mississippi Railroad Commission*, 203 U. S. 496, the company made what it called a "rebilling rate" on grain shipped from Vicksburg to Meridian, Mississippi, which was applicable only in case of shipments received at Vicksburg over the Shreveport line. It gave, however, to such shippers an option for a specified time to send other grain from Vicksburg instead, and thus it was in fact a local rate. To end this discrimination, the state commission, in 1903, fixed the same rate for all grain products shipped from Vicksburg to Meridian. It was urged that the effect of the order would be to force the plaintiff to enter into joint through interstate tariffs and divisions with all lines reaching Vicksburg by rail or river whether it desired such arrangements or not. The court sustained the order holding that it was competent for the State to enforce equality as to local transportation, and that this equality could not be defeated "in respect to any local shipments by arrangements made with or to favor outside companies."

In *Northern Pacific Railway Co.* v. *North Dakota*, 216 U. S. 579, the Attorney General of North Dakota charged the company with continuous violation of a law fixing rates for the carriage of coal within the State (North Dakota, Laws of 1907, c. 51) and asked for an injunction. It appears by the record that in its return to the rule to show cause in the state court, the company alleged that the statute was void because repugnant to the commerce clause and also that the rate fixed thereby was confiscatory. In support of the last contention the return set forth that the maximum rates for carrying coal which the company was allowed to charge under the act in question, were

greatly lower than the rates for similar service fixed by Minnesota for that State (reference being made to c. 232 of the Laws of 1907, the commodity rate act now in question) and those fixed by the Railroad Commissions of Illinois and Iowa, respectively; and that the conditions existing in North Dakota made it impossible to transport coal at a less rate than in the States named. The contention that the act violated the interstate commerce clause was said by the Supreme Court of the State to be based upon the assumption that state regulation of local rates on interstate lines amounted to an interference with interstate commerce. In view of the decisions of this court, the last question was not considered open to debate. *State* v. *Northern Pacific Railway Co.*, 19 N. Dak. 45, 55. This ruling was not challenged by the argument for the plaintiff in error here, and the question as to interference with interstate commerce was treated as removed from the case by the holding of the state court that the rates applied only to transportation within the State. (216 U. S., p. 580.)

To suppose, however, from a review of these decisions, that the exercise of this acknowledged power of the State may be permitted to create an irreconcilable conflict with the authority of the Nation, or that through an equipoise of powers an effective control of interstate commerce is rendered impossible, is to overlook the dominant operation of the Constitution which, creating a Nation, equipped it with an authority, supreme and plenary, to control National commerce and to prevent that control, exercised in the wisdom of Congress, from being obstructed or destroyed by any opposing action. But, as we said at the outset, our system of government is a practical adjustment by which the National authority as conferred by the Constitution is maintained in its full scope without unnecessary loss of local efficiency. It thus clearly appears that, under the established principles governing

state action, the State of Minnesota did not transcend the limits of its authority in prescribing the rates here involved, assuming them to be reasonable intrastate rates. It exercised an authority appropriate to its territorial jurisdiction and not opposed to any action thus far taken by Congress.

The interblending of operations in the conduct of interstate and local business by interstate carriers is strongly pressed upon our attention. It is urged that the same right-of-way, terminals, rails, bridges, and stations are provided for both classes of traffic; that the proportion of each sort of business varies from year to year and, indeed, from day to day; that no division of the plant, no apportionment of it between interstate and local traffic, can be made to-day, which will hold to-morrow; that terminals, facilities and connections in one State aid the carrier's entire business and are an element of value with respect to the whole property and the business in other States; that securities are issued against the entire line of the carrier and cannot be divided by States; that tariffs should be made with a view to all the traffic of the road and should be fair as between through and short-haul business; and that, in substance, no regulation of rates can be just, which does not take into consideration the whole field of the carrier's operations, irrespective of state lines. The force of these contentions is emphasized in these cases, and in others of like nature, by the extreme difficulty and intricacy of the calculations which must be made in the effort to establish a segregation of intrastate business for the purpose of determining the return to which the carrier is properly entitled therefrom.

But these considerations are for the practical judgment of Congress in determining the extent of the regulation necessary under existing conditions of transportation to conserve and promote the interests of interstate commerce. If the situation has become such, by reason of the inter-

blending. of the interstate and intrastate operations of interstate carriers, that adequate regulation of their interstate rates cannot be maintained without imposing requirements with respect to their intrastate rates which substantially affect the former, it is for Congress to determine, within the limits of its constitutional authority over interstate commerce and its instruments the measure of the regulation it should supply. It is the function of this court to interpret and apply the law already enacted, but not under the guise of construction to provide a more comprehensive scheme of regulation than Congress has decided upon. Nor, in the absence of Federal action, may we deny effect to the laws of the State enacted within the field which it is entitled to occupy until its authority is limited through the exertion by Congress of its paramount constitutional power.

*Second.  Are the State's acts and orders confiscatory?*

The rate-making power is a legislative power and necessarily implies a range of legislative discretion. We do not sit as a board of revision to substitute our judgment for that of the legislature, or of the commission lawfully constituted by it, as to matters within the province of either. *San Diego Land & Town Co. v. Jasper*, 189 U. S. 439, 446. The case falls within a well defined category. Here we have a general schedule of rates, involving the profitableness of the intrastate operations of the carrier taken as a whole, and the inquiry is whether the State has overstepped the constitutional limit by making the rates so unreasonably low that the carriers are deprived of their property without due process of law and denied the equal protection of the laws.

The property of the railroad corporation has been devoted to a public use. There is always the obligation springing from the nature of the business in which it is engaged—which private exigency may not be permitted to ignore—that there shall not be an exorbitant charge .

for the service rendered. But the State has not seen fit to undertake the service itself; and the private property embarked in it is not placed at the mercy of legislative caprice. It rests secure under the constitutional protection which extends not merely to the title but to the right to receive just compensation for the service given to the public. *Stone* v. *Farmers' Loan & Trust Co., supra; Georgia Banking Co.* v. *Smith,* 128 U. S. 174, 179; *Chicago &c. Ry. Co.* v. *Minnesota, supra; Reagan* v. *Farmers' Loan & Trust Co., supra; St. Louis & S. F. Ry. Co.* v. *Gill,* 156 U. S. 649, 652; *Covington &c. Turnpike Road Co.* v. *Sandford,* 164 U. S. 578, 596, 597; *Smyth* v. *Ames, supra; San Diego Land & Town Co.* v. *National City,* 174 U. S. 739, 754; *San Diego Land & Town Co.* v. *Jasper, supra; Stanislaus County* v. *San Joaquin Co.,* 192 U. S. 201, 215; *Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1, 17; *Willcox* v. *Consolidated Gas Co.,* 212 U. S. 19, 41.

In determining whether that right has been denied, each case must rest upon its special facts. But the general principles which are applicable in a case of this character have been set forth in the decisions.

(1.) The basis of calculation is the "fair value of the property" used for the convenience of the public. *Smyth* v. *Ames, supra* (p. 546). Or, as it was put in *San Diego Land & Town Co.* v. *National City, supra* (p. 757), "What the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public." See also *San Diego Land & Town Co.* v. *Jasper, supra; Willcox* v. *Consolidated Gas Co., supra.*

(2.) The ascertainment of that value is not controlled by artificial rules. It is not a matter of formulas; but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts. The scope of the inquiry was thus broadly described in *Smyth* v. *Ames, supra* (pp. 546–547): "In order to ascertain that value,

the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction; the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth."

(3.) Where the business of the carrier is both interstate and intrastate, the question whether a scheme of maximum rates fixed by the State for intrastate transportation affords a fair return, must be determined by considering separately the value of the property employed in the intrastate business and the compensation allowed in that business under the rates prescribed. This was also ruled in the *Smyth Case* (*id.*, p. 541). The reason, as there stated, is that the State cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, and, on the other hand, the carrier cannot justify unreasonably high rates on domestic business because only in that way is it able to meet losses on its interstate business.

In the present cases, the necessity of this segregation of the domestic business in determining values and results of operation, was recognized by both parties. Voluminous testimony was taken before the Master, and numerous exhibits containing data and calculations were submitted for the purpose of showing their respective estimates

of the value of the entire property of the carriers in Minnesota, the amount of income and expense in that State, their theories of apportionment between the interstate and intrastate business, and their contentions as to the net return for intrastate transportation under the state rates. The multitude of facts which are involved makes it impossible here to present a comprehensive review, even in a summary way. We must be content with a statement of the salient points and deal only with those matters which, after a careful consideration of the entire record, we regard as controlling our decision.

In each of the three cases (save in certain particulars with respect to that of the Minneapolis and St. Louis Railroad Company) the method adopted by the Master was as follows:

The period taken for the purpose of testing the sufficiency of the rates was the fiscal year ending June 30, 1908. During this period, all the rates in question, freight and passenger, were actually in force, with the exception of the commodity rates prescribed by the act of April 18, 1907, which had been enjoined. The amount of the reduction in the intrastate revenue which would have been caused by the application of the commodity rates is shown.

The Master found the present value of the entire property of the carrier, used in the public service in the State of Minnesota. This valuation was as of June 30, 1908, and was made on the basis of the cost of reproduction new. The Master also made findings as to the original cost of construction, and as to the present value on the basis of cost of reproduction new, of the entire system of the carrier. The estimated value of the railroad property within the State was divided between the freight and passenger business upon the relation of the gross revenue derived from each. The part of the total value which was thus assigned to the freight business within the State was then divided between the interstate and intra-

state freight business on the basis of gross revenue; and a similar division was made between the interstate and intrastate business of the property value assigned to the passenger department. In this way the Master found the value of the property used in intrastate transportation, freight and passenger, upon which he computed the net return received by the carrier.

There was no substantial dispute as to the amount of the entire revenue assignable to the State or as to its division between interstate and intrastate business, as an examination of the transactions in which the revenue was obtained permitted the making of the requisite apportionments with reasonable certainty.

The Master also ascertained the total expense incurred by the carrier within the State. This expense was first divided between freight and passenger business. Those items of cost which were directly incurred in each sort of business, and not common to both, were directly assigned; and such items were found to cover about sixty per cent. of all expenses. The remaining items, those of common expense, were divided between the freight and passenger business upon the relation, as to most of them, of revenue train-miles, and as to the others, of revenue engine-miles.

Having thus ascertained the share of the expense within the State of the freight and passenger departments respectively, it remained to divide that share, in each case, between the interstate and intrastate business. This apportionment was made, in the case of freight expense, upon what was termed an "equated ton-mile basis;" and in the case of passenger expense upon an "equated passenger-mile basis." That is to say, the Master concluded that the cost per ton-mile of doing the intrastate freight business was at least two and one-half times the cost per ton-mile of the interstate freight business, and hence he divided the total freight expense according to the relation of the interstate and intrastate ton-miles after

the latter had been increased two and one-half times. In the case of the passenger expense, he concluded that the cost per passenger-mile in the intrastate business was at least fifteen per cent. greater than that in the interstate business, and the total passenger expense was divided upon the relation of passenger-miles after increasing the intrastate passenger-miles fifteen per cent.[1] By the use of equalizing factors, the same result was obtained upon what was called an "equated revenue basis." [2]

---

[1] The method is illustrated from the following extract from the findings in the *Northern Pacific Case:*

EQUATED TON-MILE BASIS.

Freight—On basis of 1 Intrastate
    ton mile costing as much as 2.5
    Interstate ton miles.

|  | Actual | Equated | Proportion | Operating Exps. |
|---|---|---|---|---|
| Intra. ton mi. | $130,580,988 \times 2.5 =$ | $326,452,470 =$ | $25.362\%$ | $1,355,273.82 |
| Inter. ton mi. | $960,709,494 \times 1.0 =$ | $960,709,494 =$ | $74.638\%$ | 3,988,444.43 |
|  | 1,091,290,482 | $1,287,161,964 =$ | $100.\%$ | $5,343,718.25 |

EQUATED PASSENGER-MILE BASIS.

Passenger—On basis of 100 Intra-
    state passenger miles costing as
    much as 115 Interstate passen-
    ger miles.

|  | Actual | Equated[1] | Proportion | Operating Exps. |
|---|---|---|---|---|
| Intrastate passenger miles | $52,317,140 \times 1.15 =$ | $60,164,711 =$ | $37.347\%$ | $863,325.18 |
| Interstate passenger miles | $100,931,180 \times 1.00 =$ | $100,931,180 =$ | $62.653\%$ | 1,448,306.77 |
|  | 153,248,320 | $161,095,891 =$ | $100.\%$ | $2,311,631.95 |

[2] *Equated Revenue Basis.*—In the case of the Northern Pacific Company it was found that the relation of freight revenue per ton per mile derived from the intrastate business, as compared with the interstate business, was as 1.4387 is to 1.0000. The relation of cost per ton per mile in the intrastate business in proportion to revenue, to the cost

The net profits of the interstate and intrastate busi-. nesses, respectively, passenger and freight, were then found by deducting the apportioned share of expense from the apportioned share of revenue, and the rate per cent. of the net profit upon the property value assigned to each sort of business was computed. The Master concluded that the returns from intrastate transportation were . unreasonably low and hence that the rates in question were confiscatory.

· The validity of the result depends upon the estimates of the value of the property within the State and the apportionments both of value and of expense between interstate and intrastate operations.

---

per ton per mile in interstate business in proportion to revenue, was then found to be as 1.7377 is to 1.0000, as follows:

$$\frac{250}{100} \div \frac{1.4387}{1.0000} = \frac{1.7377}{1.0000}$$

The actual intrastate freight revenue was multiplied by 1.7377 to obtain the equated revenue and thus the same percentages were obtained as on the equated ton-mile basis, as follows:

EQUATED REVENUE BASIS.  FREIGHT.

|  | Actual Revenue | Equated Revenue |
|---|---|---|
| Intrastate | $1,555,342.92×1.7377=$2,702,719.39=25.362% | |
| Interstate | 7,953,734.41×1.   = 7,953,734.41=74.638% | |

$10,656,453.80=100.%

The relation of revenue per passenger mile intrastate and interstate was found to be as 1.0092 is to 1.0000; and thus, the relation of cost per passenger mile in relation to revenue was as 1.1395 is to 1.0000. The division was then made as follows:

EQUATED REVENUE BASIS.  PASSENGER.

|  | Actual Revenue | Equated Revenue |
|---|---|---|
| Intrastate | $1,015,150.34×1.1395=$1,156,763.81=37.347% | |
| Interstate | 1,940,718.17×1.   = 1,940,718.17=62.653% | |

$3,097,481.98=100.%

It will be convenient to take up the three cases separately:

1. *Northern Pacific Railway Company.*

The par value, April 30, 1908, of the stock of this company was found to be $215,539,634.99, and of the bonds $190,256,577.66; total, $405,796,392.65. (Included in this statement of capital stock is the sum of $60,539,634.99 received to April 30, 1908, upon subscriptions to new capital stock ($95,000,000) authorized by stockholders' resolution January 7, 1907.)

These securities and their value in the market rest upon the entire property of the company. They include assets of considerable value (for example, the stock of the Northwestern Improvement Company owning extensive coal lands) which, however, do not form part of what may be called the operating property of the company, or that devoted to the public service, upon which the fair return is to be calculated (15 I. C. C. Rep. 376, 397, 407). Referring to the market value of the securities, the Master said: "Assets and property not devoted to public service have not been valued, and as they are a large element in stock valuation it follows that value of bonds and stocks is wholly unreliable and cannot be used in these cases as an element in determining the value of operating property or as a basis for rate-making." In this view the Master was undoubtedly right.

Much evidence was produced before the Master for the purpose of showing the actual cost of construction and equipment of the entire railroad system from the beginning down to April 30, 1908. This, the Master states, could be shown only by the corporate books and records; and in the early history of the original company these are somewhat obscure and uncertain and, by reason of lapse of time, could not be verified by other proof. The total investment cost of the railroad system of the Northern Pacific thus shown, was $369,252,755. This included

certain items which the Master held not to be properly allowable as a part of the cost, and after their deduction the cost was found to be $312,243,555. Of this investment cost, it appears from the evidence submitted by the company's controller that the sum of $128,184,985.82 was expended for construction and equipment, and for improvements and betterments, during the period from September 1, 1896, to April 30, 1908. The Master found that the Minnesota track mileage is substantially 21% of the track mileage of the whole system [1] and that if the cost were proportioned accordingly, the amount assignable to the State of the entire cost of construction and equipment, as stated, would be $65,571,462.

The Master, however, and the court below in confirming his findings, held that rates were not to be predicated upon the original investment.

Taking, as the basis, the cost of reproduction new, the Master found the value of the entire railroad system or operating property of this company to be $452,666,489. [2] The value of that portion of the system which was in the State of Minnesota was separately found, on the same basis, to be $90,204,545. It was upon this estimate of the value of the property in the State, as apportioned between the interstate and intrastate business, that the Master computed the rate of return.

The total net profits of the company for the fiscal year

---

[1] The Master found that the total track mileage of the system was 7695.80 and that the track mileage in Minnesota was 1625.20. In both cases spurs, yards and sidings were included. In Minnesota, as shown by the company's statement, the "passing, side and industry tracks" amounted to 512.41 miles, leaving for the single track, and second and third main track, miles, a total of 1112.79 miles.

[2] This estimate did not include the interest of the Northern Pacific in the Spokane, Portland & Seattle Railroad which was under construction, or the Big Forks & International Falls Railway or the Minnesota & International Railway, or in certain lines in Manitoba under lease which were found not to be part of the operating system.

ending June 30, 1908, from its Minnesota business (inter-
state and intrastate) was found to be $5,431,514.56. This
was equal to 6.021% on the entire estimated value of the
property. This showing of the results of the entire business
at once directs attention to the importance of the methods
adopted in making apportionments, but before consider-
ing these, the question is presented as to the soundness of
the underlying estimate of value. May it be accepted as a
basis for a finding that the rates are confiscatory?

*Values.* The items entering into the valuation, are
set forth in the margin.[1]

---

[1] *Valuation—Northern Pacific.*

|  |  |  |
|---|---|---|
| 1. | Lands for right of way, yards and terminals. . . | $21,024,562 |
| 2. | Grading, clearing and grubbing. . . . . . . . . . . . . . | 12,331,541 |
| 3. | Protection work, rip-rap, retaining walls . . . . . . | 374,091 |
| 4. | Tunnels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 253,250 |
| 5. | Cross-ties and switch-ties . . . . . . . . . . . . . . . . . . | 3,657,576 |
| 6. | Ballast . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,960,969 |
| 7. | Rails. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,645,307 |
| 8. | Track fastenings. . . . . . . . . . . . . . . . . . . . . . . . . | 727,228 |
| 9. | Switches, frogs and railroad crossings. . . . . . . . . | 303,717 |
| 10. | Track laying and surfacing. . . . . . . . . . . . . . . . . | 1,600,591 |
| 11. | Bridges, trestles and culverts. . . . . . . . . . . . . . . . | 3,586,063 |
| 12. | Track and bridge tools . . . . . . . . . . . . . . . . . . . . | 28,073 |
| 13. | Fences, cattleguards and signs. . . . . . . . . . . . . . . | 471,609 |
| 14. | Stockyards and appurtenances. . . . . . . . . . . . . . . | 37,098 |
| 15. | Water stations. . . . . . . . . . . . . . . . . . . . . . . . . . . | 436,489 |
| 16. | Coal stations. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 120,039 |
| 17. | Stations, buildings and fixtures . . . . . . . . . . . . . | 920,423 |
| 18. | Miscellaneous buildings. . . . . . . . . . . . . . . . . . . . | 1,054,874 |
| 19. | Steam and electric power plants, gas plants . . . | 196,338 |
| 20. | General repair shops . . . . . . . . . . . . . . . . . . . . . | 1,162,934 |
| 21. | Shop machinery and tools. . . . . . . . . . . . . . . . . . | 529,322 |
| 22. | Engine houses, turntables and cinder pits . . . . . | 1,026,346 |
| 23. | Track scales. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 38,520 |
| 24. | Docks and wharves . . . . . . . . . . . . . . . . . . . . . . | 768,306 |
| 25. | Interlocking plants and  | |
| 26. | other signal apparatus  | 114,430 |

The first item is:

"Lands for right-of-way, yards and terminals—$21,024,562.90."

This is for the bare land, without structures or improvements of any sort, as the entire cost of reproduction in building the road and erecting all the existing structures is covered in other items. The Master states that the amount thus allowed for land is made up as follows:

"Terminal properties, St. Paul appraisement of Read, Watson & Taylor, as modified by railroad company. . . . . . . . . . .. .. . $7,645,100.24

"Add 5 per cent for the cost of acquisition and consequential damages. . . . . . . . . . . . . . . . . . 382,255.01

| | |
|---|---|
| 27. 28. } Telegraph and telephone lines. . . . .. . . . . . . . | 285,145 |
| 28½. General office furniture . . . . . . . . . . . . . . . . . . | 73,654 |
| 29. Solidification of roadbed. (Absorbed in above) | |
| Total 1 to 28½ . . . . . | $58,728,685 |
| 30. Engineering, superintendence, legal expenses, 4½ per cent 1 to 28. . . . . . . . . . . . . . . . . . . . | 2,785,036 |
| 31. Locomotives . . . . . . : . . . . . . . . . . . . . . . . . . | 3,454,040 |
| 32. Passenger equipment. . . . . . . . . . . . . . . . . . . | 1,349,829 |
| 33. Freight car equipment. . . . . . . . . . . . . . . . . . | 7,519,722 |
| 34. Miscellaneous equipment . . . . . . . . . . . . . . . . . | 372,477 |
| 35. Marine equipment (none) | |
| Total items 1 to 34 . . . . . . . . | $74,209,789 |
| 36. Freight on construction material—absorbed. | |
| 37. Contingencies, 5 per cent 1 to 34. . . . . . . . . . . . | 3,710,479 |
| 38. Stores and supplies in Minnesota . . : . . . . . . . . . | 2,658,976 |
| 39. Interest during construction, 4 per cent 2½ years Items 1 to 36 . . . . . . . . . . . . . . . . . . . . . | 7,420,957 |
| 40. Interest in terminal properties, St. Paul depot, Duluth depot, Minnesota Transfer. . . . . . . . | 2,204,344 |
| | $90,204,545 |

| | |
|---|---:|
| "Property acquired after appraisement. . . . . . . . . . . . . . . . . . . . . . . | 328,725.69 |
| "Minneapolis appraisement of Elwood, Barney and Ridgeway, as modified by railway company. . . . . . . . . . . . . . . . . . . | 4,027,616.17 |
| "Add 5 per cent for acquisition and consequential damages. . . . . . . | 201,380.80 |
| "Property acquired after appraisement. . . . . . . . . . . . . . . . . . . | 227,737.26 |
| "Duluth, appraisement of Stryker, Mendenhall and Little. . . . . . . | 3,602,443.43 |
| "Add 25 per cent for railway value, cost of acquisition and consequential damages. . . . . . . . . . . | 900,610.85 |
| "Total value of terminals. . . . . . . | 17,315,869.45 |
| "Lands outside of terminals. . . . . | 3,708,693.45 |
| "Grand Total. . . . . . . . . . . . . . . . | 21,024,562.90" |

The appellants insist that no more than $9,498,099.27 should have been allowed.

It is contended that the valuation was made upon a wrong theory; that it is a speculative estimate of "cost of reproduction;" that it is largely in excess of the market value of adjacent or similarly situated property; that it does not represent the present value, in any true sense, but constitutes a conjecture as to the amount which the railway company would have to pay to acquire its right-of-way, yards and terminals, on an assumption, itself inadmissible, that, while the railroad did not exist, all other conditions, with respect to the agricultural and industrial development of the State, and the location, population and activities of towns, villages and cities, were as they now are.

We may first consider the basis for the finding with respect to the "lands outside terminals," that is, the right-of-way and station grounds, etc., outside the three cities.

(a) *Lands outside terminals.* The complainants' witness was Mr. Cooper, the Land Commissioner of the company, who has charge of the land grants for its entire system, of its right-of-way and land purchases, and has had a wide experience in connection with land values along the lines of the railway. In the latter part of 1906, the State notified the company to report the value of its properties, requiring a statement in one column of the "market value" and in another column, of the "value for railway purposes." Mr. Cooper was instructed to prepare the valuation for this report. From the information he received in special inquiries, and his own knowledge, and following what he understood to be the instructions from the State, he set down under the heading of "market value," not the market value in the proper sense of that term, but what in his judgment it would cost the railroad company to acquire the land. This included an excess which he estimated the company would have to pay over the market value of contiguous and similar property if it were called upon to undertake such a reproduction of its right-of-way. It did not, however, embrace an allowance for payments which might have to be made for improvements that possibly might be found upon the property in such case, or for the consequential or severance damages which might possibly have to be met, or for the expense of acquisition. These supposed additional outlays he undertook to estimate. For this purpose he increased the "market value" as stated (in the case of agricultural lands generally multiplying it by three) and thus reached the amount set down as the "value for railway purposes." As it serves clearly to illustrate the theory upon which the land valuations were made, we make the following excerpts from Mr. Cooper's testimony:

"The Master: When you speak of value, you mean cost of
    purchase?

"Witness: Cost of purchase; we are using the word 'value' somewhat wrongly, as we are talking along here. It is the cost of purchasing that property to-day.

*    *    *    *    *    *    *    *

"Witness: The word 'value' doesn't seem to me to fit this case, because all the time we are figuring on the cost of reproducing this property, and our instructions from the State use the word 'reproduce.' Now, if a railroad company could buy property at what is generally considered its value, the word 'value' would fit in all right, but there is this excess which a railroad company has to pay beyond what is generally accepted as its value which increases the cost of reproducing a railroad property.

"Q. And this excess which you now speak of is included in your market values as reported to the State and used in your testimony? A. That is right.    *    *

"Q. .. . . Well, now, does the term 'market value' as you have used it in making this report to the State and in your testimony here, have the same meaning, or is it used in the same sense with reference to the values you have fixed and reported to the State for properties on the right-of-way outside of the terminals and outside of the larger cities? A. Oh, yes.

"Q. As in the cities here? A. Yes; the same rule was applied all through in the Minnesota valuations.

*    *    *    *    *    *    *    *

"Q. Therefore, your judgment as to the value of the railroad property is always that it is higher than the value of contiguous property? A. Yes, yes, that is true.    *    *    *    *    *    *    *    *

"Q. So that, in every case, what you call the market value is the value of contiguous or similarly situated property, with an additional amount which a railroad company is ordinarily compelled to pay? A. That is right.    *    *    *    *    *    *    *    *

"Q. You have put into the market value the excess which a railroad company pays for land? A. That is correct.

"Q. Then, when you multiply that by three, you are multiplying by three one of the elements going to make up excessive cost to a railroad company? A. That is right.   *   *   *   *   *   *

"Q. And you are unable to state how much upon the average you have added to the true or normal market value, to allow for the additional amount which the railroad company would have to pay upon the hypothesis that it is now compelled to purchase the land? A. That is correct.

"Q. And then having determined, to your satisfaction at what figure or sum you would place the market value of this property to the Railroad Company, as you have described, you have added another sum for severance damage, cost of improvements unnecessary to the Company, easements in abutting property, and general expenses? A. That is correct.

"Q. And you have determined that, in agricultural communities this second addition is shown by the use of the multiple 3? A. I think the multiple of 3 is too low, and I so testified in this case. When you are going through a highly cultivated country, I think the multiplier of 3 is not enough.

"Q. But that is what you used for the purpose of the right-of-way value of land through the agricultural communities? A. That is right, in this State.

"Q. And in the cities, in the three large terminals, you have added to what you describe as the market value of the lands to the Railroad Company, ascertained as described by you already, the amount necessary to produce the difference shown in your testimony between the market value of the terminals and the right-of-way value? A. That is right.

"Q. And while you are able to show, and we can ascertain

from an inspection of your testimony, the amount of the difference between the market value to the Railroad Company, as you have described, and the right-of-way value, and, in the rural communities or agricultural districts, the difference between the market value to you and the right-of-way value, there is nothing in any of your exhibits which will show, nor are you now prepared to state, the difference in what might be termed the normal, true, ordinary market value of the lands to the ordinary individual, and the sum which you have fixed as the market value to the Railroad Company if it were now compelled to purchase? A. That is correct."

The "market value" of the lands (outside of the three cities) thus fixed and reported to the State was $2,008,491.50, and the increased amount estimated, in the manner stated, which was reported as the "value for railway purposes" was $4,944,924.60. The latter amount was submitted by the complainants in this case as the value of the lands. The Master thought that the complainants' witness used too large a multiplier and allowed 75 per cent. of the amount thus claimed, or $3,708,693.45, stating that this was determined upon as the "fair reproduction value of the property." This allowance, it will be observed, was about $1,700,000 in excess of Mr. Cooper's estimate of "market value" as that term was used in making the report.

(b) *Terminal properties.* This term is used to designate the lands for the right-of-way, yards and terminals in St. Paul, Minneapolis and Duluth. The total original cost of these lands to the company (according to its statement based on the best information obtainable) including purchases to April 30, 1908, was $4,527,228.76. The Master allowed as their value, apart from the improvements made by the company which, as we have said, were em-

braced in the other items of reproduction cost, the sum of $17,315,869.45.

In .preparing the valuation for the report to the State, Mr. Cooper employed real estate men in each of the cities to make an appraisement.  He instructed them, as he testifies, "to make a conservative report of the cost reproducing the properties owned by the company in each of their respective cities."  They divided the property into districts and reported their estimate of units of value, as, for example, by the square foot.  Mr. Cooper took these reports, discussed their valuations with the appraisers and aided by his own knowledge, formed an independent judgment, in no case increasing and in some instances (with respect to certain St. Paul, and Minneapolis property) reducing the appraisers' values.  He then set forth under the heading "market value" in the report to the State, as described in the testimony we have quoted, his estimate of what it would cost the company to purchase these lands, exclusive of improvements that might be upon them, severance and consequential damages and expenses incident to acquisition.  The amounts he thus fixed were as follows: For the property in St. Paul, $7,645,100.24; in Minneapolis, $4,027,616.17; in Duluth, $3,555,593.93.  In the case of the St. Paul and Minneapolis properties the amounts are precisely those adopted by the Master in his findings, and to this he adds 5 per cent. to cover cost of acquisition and consequential damages. The Master was of the opinion that the appraisers of these properties were "fully impressed with their value for railroad purposes." and that their appraisement as verified by them before him and modified by the railway company "is a generous valuation and should be accepted as full railroad value of the terminal properties," and it was so accepted with the addition above. stated.  With respect to the Duluth property, where the appraisement appears to have rested upon the ordinary values of real estate,

the Master sets forth as the appraised value, $3,602,443.43, to which he adds 25 per cent. or $900,610.85 "for railway value, cost of acquisition and consequential damages."

In reviewing the findings, the court below reached the conclusion that "the Master in effect found that the cost of reproduction and the present value of the lands for the terminals in the three great cities, including therein all cost of acquisition, consequential damages, and value for railroad use which he allowed, was only about 30 per cent. more than the normal value of the lands in sales between private parties. He found the value of the lands outside the terminals to be only twice their normal value."

From our examination of the evidence we are unable to conclude that the excess stated may be thus limited. What is termed the normal value does not satisfactorily appear. It further will be observed—from the summary of valuations we have set forth in the margin [1]—that the amount thus allowed in Item 1 for lands, yards and terminals, both in and out of the three cities ($21,024,562), was included in the total on which $4\frac{1}{2}$ per cent. was allowed in Item 30 for "Engineering, superintendence, legal expenses," and again was included in the total on which 5 per cent. was allowed in Item 37 for "Contingencies," and, in addition, was included in the total on which 10 per cent. was allowed in Item 39 for "Interest during construction."

These are the results of the endeavor to apply the cost-of-reproduction method in determining the value of the right-of-way. It is at once apparent that, so far as the estimate rests upon a supposed compulsory feature of the acquisition, it cannot be sustained. It is said that the company would be compelled to pay more than what is the normal market value of property in transactions between private parties; that it would lack the freedom

---

[1] See note, p. 442.

they enjoy, and, in view of its needs, it would have to give a higher price. It is also said that this price would be in excess of the present market value of contiguous or similarly situated property. It might well be asked, who shall describe the conditions that would exist, or the exigencies of the hypothetical owners of the property, on the assumption that the railroad were removed? But, aside from this, it is impossible to assume, in making a judicial finding of what it would cost to acquire the property, that the company would be compelled to pay more than its fair market value. It is equipped with the governmental power of eminent domain. In view of its public purpose, it has been granted this privilege in order to prevent advantage being taken of its necessities. It would be free to stand upon its legal rights and it cannot be supposed that they would be disregarded.

It is urged that, in this view, the company would be bound to pay the "railway value" of the property. But, supposing the railroad to be obliterated and the lands to be held by others, the owner of each parcel would be entitled to receive on its condemnation, its *fair market value* for all its available uses and purposes. *United States* v. *Chandler-Dunbar Water Power Co.*, decided May 26, 1913, 229 U. S. 53. If, in the case of any such owner, his property had a peculiar value or special adaptation for railroad purposes, that would be an element to be considered. *Mississippi &c. Boom Company* v. *Patterson*, 98 U. S. 403; *Shoemaker* v. *United States*, 147 U. S. 282; *United States* v. *Chandler-Dunbar Co.*, *supra*. But still the inquiry would be as to the fair market value of the property; as to what the owner had lost, and not what the taker had gained. *Boston Chamber of Commerce* v. *Boston*, 217 U. S. 189, 195. The owner would not be entitled to demand payment of the amount which the property might be deemed worth to the company; or of an enhanced value by virtue of the purpose for which it was taken; or of an

increase over its fair market value, by reason of any added value supposed to result from its combination with tracks acquired from others so as to make it a part of a continuous railroad right-of-way held in one ownership. *United States* v. *Chandler-Dunbar Co., supra; Boston Chamber of Commerce* v. *Boston, supra.* There is no evidence before us from which the amount which would properly be allowable in such condemnation proceedings can be ascertained.

Moreover, it is manifest that an attempt to estimate what would be the actual cost of acquiring the right-of-way, if the railroad were not there, is to indulge in mere speculation. The railroad has long been established; to it have been linked the activities of agriculture, industry and trade. Communities have long been dependent upon its service, and their growth and development have been conditioned upon the facilities it has provided. The uses of property in the communities which it serves are to a large degree determined by it. The values of property along its line largely depend upon its existence. It is an integral part of the communal life. The assumption of its non-existence, and at the same time that the values that rest upon it remain unchanged, is impossible and cannot be entertained. The conditions of ownership of the property and the amounts which would have to be paid in acquiring the right-of-way, supposing the railroad to be removed, are wholly beyond reach of any process of rational determination. The cost-of-reproduction method is of service in ascertaining the present value of the plant, when it is reasonably applied and when the cost of reproducing the property may be ascertained with a proper degree of certainty. But it does not justify the acceptance of results which depend upon mere conjecture. It is fundamental that the judicial power to declare legislative action invalid upon constitutional grounds is to be exercised only in clear cases. The constitutional invalidity

must be manifest and if it rests upon disputed questions of fact, the invalidating facts must be proved. And this is true of asserted value as of other facts.

The evidence in these cases demonstrates that the appraisements of the St. Paul and Minneapolis properties which were accepted by the Master were in substance appraisals of what was considered to be the peculiar value of the railroad right-of-way. Efforts to express the results in the terms of a theory of cost of reproduction fail, as naturally they must, to alter or obscure the essential character of the work undertaken and performed. Presented with an impossible hypothesis, and endeavoring to conform to it, the appraisers—men of ability and experience—were manifestly seeking to give their best judgment as to what the railroad right-of-way was worth. And doubtless it was believed that it might cost even more to acquire the property, if one attempted to buy into the cities as they now exist and all the difficulties that might be imagined as incident to such a "reproduction" were considered. The railroad right-of-way was conceived to be a property *sui generis*, "a large body of land in a continuous ownership," representing one of the "highest uses" of property and possessing an exceptional value. The estimates before us, as approved by the Master, with his increase of 25 per cent. in the case of the Duluth property, must be taken to be estimates of the "railway value" of the land; and whether or not this is conceived of as paid to other owners upon a hypothetical reacquisition of the property is not controlling when we come to the substantial question to be decided.

That question is whether, in determining the fair present value of the property of the railroad company as a basis of its charges to the public, it is entitled to a valuation of its right-of-way not only in excess of the amount invested in it, but also in excess of the market value of contiguous and similarly situated property. For the pur-

pose of making rates, is its land devoted to the public use to be treated (irrespective of improvements) not only as increasing in value by reason of the activities and general prosperity of the community, but as constantly outstripping in this increase, all neighboring lands of like character, devoted to other uses? If rates laid by competent authority, state or National, are otherwise just and reasonable, are they to be held to be unconstitutional and void because they do not permit a return upon an increment so calculated?

It is clear that in ascertaining the present value we are not limited to the consideration of the amount of the actual investment. If that has been reckless or improvident, losses may be sustained which the community does not underwrite. As the company may not be protected in its actual investment, if the value of its property be plainly less, so the making of a just return for the use of the property involves the recognition of its fair value if it be more than its cost. The property is held in private ownership and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law. But still it is property employed in a public calling, subject to governmental regulation and while under the guise of such regulation it may not be confiscated, it is equally true that there is attached to its use the condition that charges to the public shall not be unreasonable. And where the inquiry is as to the fair value of the property, in order to determine the reasonableness of the return allowed by the rate-making power, it is not admissible to attribute to the property owned by the carriers a speculative increment of value, over the amount invested in it and beyond the value of similar property owned by others, solely by reason of the fact that it is used in the public service. That would be to disregard the essential conditions of the public use, and to make the public use destructive of the public right.

The increase sought for "railway value" in these cases is an increment over all outlays of the carrier and over the values of similar land in the vicinity. It is an increment which cannot be referred to any known criterion, but must rest on a mere expression of judgment which finds no proper test or standard in the transactions of the business world. It is an increment which in the last analysis must rest on an estimate of the value of the railroad use as compared with other business uses; it involves an appreciation of the returns from rates (when rates themselves are in dispute) and a sweeping generalization embracing substantially all the activities of the community. For an allowance of this character there is no warrant.

Assuming that the company is entitled to a reasonable share in the general prosperity of the communities which it serves, and thus to attribute to its property an increase in value, still the increase so allowed, apart from any improvements it may make, cannot properly extend beyond the fair average of the normal market value of land in the vicinity having a similar character. Otherwise we enter the realm of mere conjecture. We therefore hold that it was error to base the estimates of value of the right-of-way, yards and terminals upon the so-called "railway value" of the property. The company would certainly have no ground of complaint if it were allowed a value for these lands equal to the fair average market value of similar land in the vicinity, without additions by the use of multipliers, or otherwise, to cover hypothetical outlays. The allowances made below for a conjectural cost of acquisition and consequential damages must be disapproved; and, in this view, we also think it was error to add to the amount taken as the present value of the lands the further sums, calculated on that value, which were embraced in the items of "engineering, superintendence, legal expenses," "contingencies" and "interest during construction."

By reason of the nature of the estimates, and the points

to which the testimony was addressed, the amount of the fair value of the company's land cannot be satisfactorily determined from the evidence, but it sufficiently appears for the reasons we have stated that the amounts found were largely excessive.

Finding this defect in the proof, it is not necessary to consider the objections which relate to the sources from which the property was derived or its mode of acquisition, or those which are urged to the inclusion of certain lands which it is said were not actually used as a part of the plant; and we express no opinion upon the merits of these contentions.

The property other than land, as the detailed statement shows, embraced all items of construction, including road-bed, bridges, tunnels, etc., structures of every sort, and all appliances and equipment. The cost of reproduction new was ascertained by reference to the prices for such work and property. In view of the range of the questions we have been called upon to consider, we shall not extend this opinion for the purpose of reviewing this estimate, or of passing upon exceptions to various items in it, as their disposition would not affect the result.

The Master allowed the cost of reproduction new without deduction for depreciation. It was not denied that there was depreciation in fact. As the Master said, "everything on and above the road-bed depreciates from wear and weather stress. The life of a tie is from eight to ten years only. Structures become antiquated, inadequate and more or less dilapidated. Ballast requires renewal, tools and machinery wear out, cars, locomotives and equipment, as time goes on, are worn out or discarded for newer types." But it was found that this depreciation was more than offset by appreciation; that "the road-bed was constantly increasing in value"; that it "becomes solidified, embankments and slopes or excavations become settled and stable and so the better resist the effects of

rains and frost"; that it "becomes adjusted to surface drainage, and the adjustment is made permanent by concrete structures and rip-rap"; and that in other ways, a road-bed long in use "is far more valuable than one newly constructed." It was said that "a large part of the depreciation is taken care of by constant repairs, renewals, additions and replacements, a sufficient sum being annually set aside and devoted to this purpose, so that this, with the application of road-bed and adaptation to the needs of the country and of the public served, together with working capital . . . fully offsets all depreciation and renders the physical properties of the road not less valuable than their cost of reproduction new." And in a further statement upon the point, the "knowledge derived from experience" and "readiness to serve" were mentioned as additional offsets.

We cannot approve this disposition of the matter of depreciation. It appears that the Master allowed, in the cost of reproduction, the sum of $1,613,612 for adaptation and solidification of road-bed, this being included in the item of grading and being the estimate of the engineer of the state commission of the proper amount to be allowed. It is also to be noted that the depreciation in question is not that which has been overcome by repairs and replacements, but is the actual existing depreciation in the plant as compared with the new one. It would seem to be inevitable that in many parts of the plant there should be such depreciation, as for example in old structures and equipment remaining on hand. And when an estimate of value is made on the basis of reproduction new, the extent of existing depreciation should be shown and deducted. This apparently was done in the statement submitted by this company to the Interstate Commerce Commission in the *Spokane Rate Case* in connection with an estimate of the cost of reproduction of the entire system as of March, 1907. (See 15 I. C. C. Rep. 395, 396.) In

the present case, it appears that the engineer of the state commission estimated the depreciation in the property at between eight and nine million dollars. If there are items entering into the estimate of cost which should be credited with appreciation, this also should appear, so that instead of a broad comparison there should be specific findings showing the items which enter into the account of physical valuation on both sides.

It must be remembered that we are concerned with a charge of confiscation of property by the denial of a fair return for its use; and to determine the truth of the charge there is sought to be ascertained the present value of the property. The realization of the benefits of property must always depend in large degree on the ability and sagacity of those who employ it, but the appraisement is of an instrument of public service, as property, not of the skill of the users. And when particular physical items are estimated as worth so much new, if in fact they be depreciated, this amount should be found and allowed for. If this is not done, the physical valuation is manifestly incomplete. And it must be regarded as incomplete in this case. *Knoxville* v. *Knoxville Water Co.*, 212 U. S. 1, 10.

*Apportionment of Values.* As the rate of net return from the entire Minnesota business (interstate and intrastate) during the test year was 6.021 per cent. on a valuation of $90,204,545, and would be greater if computed upon a less value, we are brought to the question whether the methods of apportionment adopted are so clearly appropriate and accurate as to require a finding of confiscation of property used in the intrastate business.

The apportionment of the value of the property, as found, between the interstate and intrastate business was made upon the basis of the gross revenue derived from each. This is a simple method, easily applied, and for that reason has been repeatedly used. It has not, however, been approved by this court and its correctness

is now challenged.  Doubtless, there may be cases where the facts would show confiscation so convincingly in any event, after full allowance for possible errors in computation, as to make negligible questions arising from the use of particular methods.   But this case is not of that character.

In support of this method, it is said that a division of the value of the property according to gross earnings is a division according to the "value of the use," and therefore proper.   But it would seem to be clear that the value of the use is not shown by *gross* earnings.   The gross earnings may be consumed by expenses, leaving little or no profit. If, for example, the intrastate rates were so far reduced as to leave no net profits, and the only profitable business was the interstate business, it certainly could not be said that the value of the use was measured by the gross revenue.

It is not asserted that the relation of expense to revenue is the same in both businesses; on the contrary, it is insisted that it is widely different.   The Master found that the revenue per ton-mile in the intrastate business, as compared with the revenue per ton-mile in the interstate business, was as 1.4387 to 1.0000.   And, on his assumption as to the extra cost of doing the intrastate business, he reached the conclusion that the cost per ton-mile in proportion to the revenue per ton-mile in the intrastate business, as compared with the interstate business, was as 1.7377 to 1.0000.   It is contended, according to the computations, that only a little over 10 per cent. of the entire net revenue of the test year ($5,431,514.66) was made in the intrastate business, and that 90 per cent. thereof was made in the interstate business; but approximately 21 per cent. of the total value of the property was assigned to the intrastate business.

If the property is to be divided according to the value of the use, it is plain that the gross-earnings method is not an accurate measure of that value.

In *Chicago, Milwaukee &c. Ry. Co.* v. *Tompkins,* 176

.U. S. 167, the court below had found the value of the plaintiffs' property in South Dakota to be $10,000,000, and had divided it between the interstate and intrastate business according to the gross receipts from each. Mr. Justice Brewer, in delivering the opinion of the court, after referring to the result reached, said:

"Such a result indicates that there is something wrong in the process by which the conclusion is reached. That there was, can be made apparent by further computations, and in them we will take even numbers as more easy of comprehension. Suppose the total value of the property in South Dakota was $10,000,000, and the total receipts both from interstate and local business were $1,000,000, one half from each. Then, according to the method pursued by the trial court, the value of the property used in earning local receipts would be $5,000,000, and the per cent. of receipts to value would be, 10 per cent. The interstate receipts being unchanged, let the local receipts by a proposed schedule be reduced to one fifth of what they had been, so that instead of receiving $500,000 the company only receives $100,000. The total receipts for interstate and local business being then $600,000, the valuation of $10,000,000, divided between the two, would give to the property engaged in earning interstate receipts in round numbers $8,333,000, and to that engaged in earning local receipts $1,667,000. But if $1,667,000 worth of property earns $100,000 it earns six per cent. In other words, although the actual receipts from local business are only one fifth of what they were, the earning capacity is three fifths of what it was. And turning to the other side of the problem, it appears that if the value of the property engaged in interstate business is to be taken as $8,333,000, and it earned $500,000, its earning capacity was the same as that employed in local business—six per cent. So that although the rates for interstate business be undisturbed, the process by which the trial court

reached its conclusion discloses the same reduction in the earning capacity of the property employed in interstate business as in that employed in local business, in which the rates are reduced." (*Id.*, pp. 176–177.)

The value of the use, as measured by return, cannot be made the criterion when the return itself is in question. If the return, as formerly allowed, be taken as the basis, then the validity of the State's reduction would have to be tested by the very rates which the State denounced as exorbitant. And, if the return as permitted under the new rates be taken, then the State's action itself reduces the amount of value upon which the fairness of the return is to be computed.

When rates are in controversy, it would seem to be necessary to find a basis for a division of the total value of the property independently of revenue, and this must be found in the use that is made of the property. That is, there should be assigned to each business, that proportion of the total value of the property which will correspond to the extent of its employment in that business. It is said that this is extremely difficult; in particular, because of the necessity for making a division between the passenger and freight business and the obvious lack of correspondence between ton-miles and passenger-miles. It does not appear, however, that these are the only units available for such a division; and it would seem that, after assigning to the passenger and freight departments respectively, the property exclusively used in each, comparable use-units might be found which would afford the basis for a reasonable division with respect to property used in common. It is suggested that other methods of calculation would be equally unfavorable to the state rates, but this we cannot assume.

It is sufficient to say that the method here adopted is not of a character to justify the court in basing upon it a finding that the rates are confiscatory.

*Apportionment of Expenses.*   As already stated, it was held in dividing the freight operating expenses, that the cost of doing the intrastate freight business was two and one-half times that of doing the interstate freight business. That is to say, the division of expenses was made according to ton-miles, interstate and intrastate, after the intrastate ton-miles had been increased two and one-half times.

The substantial question is whether the proof established this extra cost with that degree of certainty which is requisite to support a decree invalidating the state rates.

It appeared that the cost of intrastate business was not kept separately or set up in the accounts or statistics of the company.

The president of the company testified as to his judgment in the matter, which was based, in the absence of such accounts, upon the general facts of operation.   His testimony was supported by that of other eminent railroad men, who testified in the Great Northern & Minneapolis and St. Louis cases.   The elements entering into the greater expense of doing intrastate business were defined to be: That the average haul was shorter, being (in the case of the Northern Pacific) 104.52 miles for intrastate transportation as against 485.3 miles for interstate transportation; that the state business had to be handled twice at terminals; that the local short-haul business used most valuable terminal facilities in order to obtain its proper handling from the larger distributing centers, and used those facilities to a greater extent for the tons handled than did the longer through business; that the amount of clerical and warehouse labor in connection with the local business was much greater than in the case of the long-haul through business; that the chances of damage were greater in the short-haul business because of the greater number of individual transactions; that in the short-haul business there was an excess of equipment for loading and unload-

ing; that local or way freight trains were "loaded lighter"; that the wear and tear on the local trains was greater because of frequent stopping and starting; that there was increased switching resulting in greater damage to equipment and tracks; that the local train was generally on the road more hours than a through train and therefore consumed more coal; that in the smaller stations the amount of shifting was large; that many of the local trains carried passengers, involving two stops at each station, one for passengers and the other for the local freight work; that the manner of operation of local trains increased the chances of injury to employés; that the short-haul business moved irregularly and spasmodically and that its facilities were worked at their full capacity only for limited periods.

From these considerations, which were elaborated in the testimony, the witness reached the conclusion that the "so-called local short-haul intrastate business costs anywhere from three to six or seven times as much as the so-called long-haul through interstate business." In the Great Northern case, the witnesses expressed the opinion that the extra cost of intrastate freight was three or four times greater than that of the interstate freight. One witness said that it would be from four to six times. These estimates, it is understood, had relation to the cost per ton mile.

The appellants do not dispute that business carried for short distances on local trains is more expensive than the handling of other business, but it is insisted that this is due solely to the different train service that it receives. It is said that all through trains start from divisional points and run from one end of the division to the other without stop; that the local trains are made up of cars carrying business destined for points intermediate the termini of the division and take up all traffic originating at the intermediate stations; that the word "local" as

applied to these trains is not synonymous with intrastate, but that the local trains carry a large part of the interstate traffic both in receiving and distributing it; and that by far the greater part of the extra cost of the local train service is properly chargeable to interstate business. It is also insisted that so far as this extra expense can be charged to intrastate business, it is adequately met by the additional revenue of that business, which per ton mile, as compared with the interstate business, is as 1.4387 to 1.0000.

To establish these propositions, and to meet the testimony of the complainants' witnesses, the appellants introduced an elaborate series of calculations, made by a professional accountant, which were deduced from the results of an extended examination of the records of the companies. The witness made computations as to the character of the freight on each road, dividing it between through and local freight upon each operating division, and then sub-dividing it between intrastate and interstate freight. It is contended by the appellants that these calculations are sufficient to show that in the case of the Northern Pacific, about 91 per cent. of the freight on through trains was interstate and about 9 per cent. intrastate, and that on the local trains the interstate freight amounted to 68.67 per cent. and the intrastate, 31.33 per cent. Calculations of this witness were also introduced showing his division of the total expenses between the passenger and freight business, and then in each department between the interstate and intrastate business; and by means of these, it was estimated that, under the rates in question (assuming them to have been applied to the business of the fiscal year ending June 30, 1907, to which the calculations were directed), the net profits on the intrastate business as a whole would have been slightly more than six per cent. upon an amount equal to the share of property value attributed to that

business by the Master's estimate and apportionment of total value.

These computations are assailed by the appellees as inaccurate and as based upon erroneous estimates. We shall not go into the details, and, for the present purpose, we may assume that the appellees are right in their criticism.

Our conclusions may be briefly stated. The statements of the complainants' witnesses as to the extra cost of intrastate business, while entitled to respect as expressions of opinion, manifestly involve wide and difficult generalizations. They embrace, without the aid of statistical information derived from appropriate tests and submitted to careful analysis, a general estimate of all the conditions of transportation and an effort to express in the terms of a definite relation, or ratio, what clearly could be accurately arrived at only by prolonged and minute investigation of particular facts with respect to the actual traffic as it was being carried over the line. The extra cost, as estimated by these witnesses, is predicated not simply of haulage charges, but of all the outlays of the freight service including the share of the expenses for maintenance of way and equipment assigned to the freight department. And the ratio, to be accurately stated, must also express the results of a suitable discrimination between the interstate and intrastate traffic on through and local trains respectively and of an attribution of the proper share of the extra cost of local train service to the interstate traffic that uses it. The wide range of the estimates of extra cost, from three to six or seven times that of the interstate business per ton mile, shows both the difficulty and the lack of certainty in passing judgment.

We are of opinion that on an issue of this character involving the constitutional validity of state action, general estimates of the sort here submitted, with respect to a subject so intricate and important, should not be

accepted as adequate proof to sustain a finding of confiscation. While accounts have not been kept so as to show the relative cost of interstate and intrastate business, giving particulars of the traffic handled on through and local trains, and presenting data from which such extra cost, as there may be, of intrastate business may be suitably determined, it would appear to have been not impracticable to have had such accounts kept or statistics prepared at least during test periods properly selected. It may be said that this would have been a very difficult matter, but the company having assailed the constitutionality of the state acts and orders was bound to establish its case, and it was not entitled to rest on expressions of judgment when it had it in its power to present accurate data which would permit the court to draw the right conclusion.

We need not separately review the findings with respect to the division of passenger expenses, as the same considerations are involved, with the distinction, however, that the extra cost attributed to the intrastate business is relatively small as compared with that charged to intrastate freight. And, in view of the conclusions reached on the controlling questions we have considered, we express no opinion with respect to the method adopted in dividing expenses between the passenger and freight departments.

For the purpose of determining whether the rates permit a fair return, the results of the entire intrastate business must be taken into account. During the test year the entire revenue, as found, from the intrastate business, passenger and freight, amounted to $2,897,912.26. All the rates in question were in force save the commodity rates and it is further found that the loss that would have accrued in intrastate commodity business, by the application of the commodity rates which were under injunction, would have amounted to $21,493.67.

As neither the share of the expenses properly attrib-

utable to the intrastate business, nor the value of the property employed in it, was satisfactorily shown, and hence it did not appear upon the facts proved that a fair return had been denied to the company, we are of the opinion that the complainant failed to sustain his bill.

(2.) *Great Northern Railway Company.* The Master found that at the time this suit was brought the par value of the stock of the company was $149,577,500, and of bonds $83,119,939; total, $232,697,439. On June 30, 1908, the par value of the stock was $209,962,750, and of bonds, $97,955,939.39; total $307,918,689.39. The property upon which these securities and their value in the market are based includes, it is found, a very considerable amount not devoted to the public service.

The balance sheet of the company of June 30, 1908, showed the book valuation of the entire system, employed in the public service, to amount to $319,681,815. The Master held that various items were included which were not properly allowable as a part of the cost, and deducting these, there remained as the book-showing of the total amount expended in construction and equipment, $295,401,213. The Minnesota track mileage was found to be practically 32.59 per cent. of the total mileage, and upon this basis, the amount assignable to the State of the total cost, as stated, amounted to $96,271,255.

The Master found that the cost of reproduction new of the entire system was $457,121,469.[1] The value of the portion of the system in Minnesota was separately found, on the basis of reproduction new, to be $138,425,291. The net profits of the company during the test year from its Minnesota business, interstate and intrastate, were $8,180,025.11, equal to 5.909 per cent. upon this estimated value.

The items entering into the estimate are the same in

[1] This did not include the interest of the company in the Spokane, Portland & Seattle Railroad, or lines under construction.

character as those set forth in the estimate of the value
of the property of the Northern Pacific Company.[1]

Included in this reproduction cost was an allowance,
for "lands for right-of-way, yards and terminals," of
$25,172,650.80, as follows:

> "St. Paul, appraisement of Read,
>   Watson and Taylor. . . . . . .  $ 6,433,348.00
> "Add 5 per cent. for cost of acquisi-
>   tion and consequential dam-
>   ages. . . . . . . . . . . . . . . . . . . . .    321,667.40
> "Minneapolis, appraisement of El-
>   wood,  Barney  and  Ridge-
>   way. . . . . . . . . . . . . . . . . . . . .  11,619.765.00
> "Add 5 per cent. for cost of acquisi-
>   tion and consequential dam-
>   ages. . . . . . . . . . . . . . . . . . . . .    580,968.15
> "Duluth, appraisement of Stryker,
>   Mendenhall and Little. . . . . . .    713,280.00
> "Add 25 per cent. for railroad value,
>   cost of acquisition and conse-
>   quential damages. . . . . . . . . . .    178,320.00
> "Total value of terminals. . . . . . .  19,847,366.55
> "Lands outside of terminals. . . . . .   5,325,284.25
> "Grand total. . . . . . . . . . . . . . . .  25,172,650.80"

The appraisements thus referred to, adopted by the
Master with the additions stated, were made by the ap-
praisers in the three cities who were employed in the case
of the Northern Pacific Company. The valuations were
made at the same time, and upon the same basis, as the
corresponding valuations in that case and are open to the
same objections. In the company's estimate of the value
of the lands outside these cities, the amount stated as the
market value was largely increased to obtain the "right-
of-way value"; with respect to lands in agricultural sec-

---

[1] See page 442.

tions, the "market value" was generally multiplied by three; and of the total amount of the estimate of the company the Master allowed seventy-five per cent. as in the Northern Pacific case.

In addition, 4½ per cent. of the aggregate land values, as found, was allowed in the item for "engineering, superintendence, legal expenses" and the further allowance of 16 per cent. of these land values was made in the item of "interest during construction" (4 per cent. for 4 years).

In the physical valuation estimated on the basis of the cost of reproduction new, the Master made no deduction for depreciation, while, on the other hand, there was included under the item of grading the sum of $3,219,642 for adaptation and solidification of road-bed. The engineer of the state commission estimated the depreciation in the property at approximately $13,000,000.

What has already been said in the case of the Northern Pacific Company with respect to estimates of value, the apportionment of value, the testimony as to the extra cost of doing the intrastate business and the division of expenses between interstate and intrastate business, is equally applicable here.[1] In these respects there is no material distinction between the two cases and the same conclusion must be reached in both.

(3.) *Minneapolis & St. Louis Railroad Company.* This case presents distinct considerations. The lines of this company consist of about 1028 miles of track of which 396 miles are operated under lease or trackage rights. Of its owned mileage (632 miles) approximately sixty per cent. is in the State of Minnesota. The Master thus describes it: "It runs south from the inland cities of St.

---

[1] The total revenue received by the Great Northern during the fiscal year 1908, from its intrastate business, passenger and freight, was $4,641,829.58; and it was found that the loss that would have been sustained by the application of the enjoined commodity rates to the intrastate commodity traffic would have amounted to $87,261.43.

Paul and Minneapolis to Des Moines, with a branch to Storm Lake, Iowa, and a branch to the South Dakota grain fields. Along its entire line it comes in sharp competition with strong intersecting railroad lines, and, while as before stated, it subserves a useful public purpose and is operated in response to public demand, it can be maintained only by the exercise of the highest economy and watchfulness in its operation and to succeed must be given greater latitude than is necessary with respect to the more favorably located and prosperous lines of railway."

The less favorable situation of the road is fully recognized by the appellants who object to its being regarded as affording a fair test of the sufficiency of the rates. They say that its "total mileage and the geographical location" are such "that it cannot be taken as typical of the railway situation in Minnesota"; and they insist that "the important and material questions are raised by the showing made in the Northern Pacific and Great Northern Cases." And the appellees, on their part, assert that "it cannot be seriously contended that the rates complained of are sufficient to yield any reasonable return on a proportionate value of the property used in the conduct of the business covered by the rates"; that the net income of the road "from all sources is scarcely sufficient to pay interest on its outstanding bonds;" that "the value of the property is greatly in excess of the par value of the bonds"; and that, as it seems to the appellees, "this company must earn more money or go into the hands of a receiver, within a comparatively short time."

The main facts are: The par value in 1908, of its stock and bonds was $30,011,800, divided as follows: stock, $10,000,000 (preferred, $4,000,000, common, $6,000,000); bonds, $20,011,800. It appeared that no dividends had been paid on the common stock since 1904. The annual interest charges amounted to $952,583.

The book cost of its property, after deducting items disallowed by the Master, was $28,574,225; and this, if divided according to mileage, would give to Minnesota as its share, $17,127,390. The mileage basis of division, however, fails to take account of the fact that the property in Minnesota has a greater relative value.

The Master found the total value of the property in Minnesota on the basis of the cost of reproduction new to be $21,608,464. In this estimate there was included the sum of $5,999,397.90 for lands, yards and terminals. Of this amount $4,556,298 was allowed for the lands in Minneapolis on the estimate of the same appraisers who had been employed in that city by the other companies; and to this the Master added five per cent. The lands outside these terminals were valued at $1,215,285.

The net earnings of the entire system, after paying only operating expenses and taxes, from 1903 to 1909, were found to be as follows: 1903, $1,398,895.30; 1904, $1,229,524.49; 1905, $1,277,870.96; 1906, $1,511,961.99; 1907, $1,419,822.54; 1908, $1,220,862.21; 1909, $1,286,-494.08.

The net earnings of the company on all its business in Minnesota, interstate and intrastate (involving any use of the property valued as stated), after paying only operating expenses and taxes, were, during the same period: 1903, $1,222,941.77; 1904, $1,052,478.74; 1905, $1,054,853.35; 1906, $1,109,260.56; 1907, $895,977.66; 1908, $742,377.46; 1909, $794,472.58. The reference in each case is to the fiscal year ending on June 30.

It thus appears that the net return from the entire Minnesota business in 1907 was about 4.14 per cent. on the estimated value of the property ($21,608,464) in Minnesota; in 1908, less than 3.5 per cent.; and in 1909, less than 3.7 per cent.

The Master made his computations, with respect to the return permitted under the rates in question, upon the

operations of the fiscal year ending June 30, 1907. The class rates had been effective from November 15, 1906, and the passenger fare act from May 1, 1907. It was estimated by the Master that the additional loss, which would have accrued in the intrastate business if these rates had been in force during the entire fiscal year ending June 30, 1907, and if in addition the commodity rate act, which was enjoined, had been applied to the intrastate traffic of that year, would have amounted to $131,358, thus making a very serious reduction in a return already inadequate; and his conclusion was that the rates in question were plainly confiscatory.

It is not necessary here to reproduce the computations, as we are satisfied, after a careful examination of the evidence, that while the methods of estimating value, and of apportionment, which have been disapproved in the discussion of the cases of the other companies are subject to the same objections in this case, so far as they have been employed, the margin of error which may be imputed to them is not sufficiently great to change the result. The net return from the entire business in Minnesota, interstate and intrastate, fell to $742,000 in the fiscal year ending June 30, 1908, and it is plain that the latter amount would have been largely reduced had the commodity rate act been enforced. In view of the actual results of the business in the State, and the clearly established facts with respect to the conditions of traffic upon this road, the conclusion cannot be escaped that the rates prescribed by the acts and orders of Minnesota would not permit a fair return to this company.

Without approving, therefore, the methods of calculation which have been adopted, but recognizing the peculiar situation of this road, and the undoubted effect of the rates in question upon its revenues, we are of the opinion that the decree, so far as it rests upon the confiscatory character of the rates as applied to this company, should

be affirmed.   In the desire, however, to prevent the possibility that the decree may operate injuriously in the future, we shall modify it by providing that the members of the Railroad and Warehouse Commission, and the Attorney-General of the State, may apply at any time to the court by bill or otherwise, as they may be advised, for a further order or decree, whenever it shall appear that, by reason of a change in circumstances, the rates fixed by the State's acts and orders are sufficient to yield to the company reasonable compensation for the services rendered.

*The decrees in Numbers 291 and 292 are reversed and the cases remanded with directions to dismiss the bills respectively without prejudice.*

*The decree in Number 293 is modified as stated in the opinion and, as modified, is affirmed.*

MR. JUSTICE MCKENNA concurs in the result.